Parkman
*v.* 
Crosby.

---

## George L. Deblois *et al. versus* The Ocean Insurance Company.

A vessel was insured " at and from Boston to St. Thomas and a market in the West Indies, and at and from thence to a port of discharge in the United States." The vessel arrived safely at St. Thomas, and having discharged about one third in weight of her cargo, received on board a quantity of mackerel for ballast, it appearing that this was necessary for her safety, and that she was not delayed thereby. She then proceeded off Ponce in Porto Rico, and being compelled by the government of that island to enter, although there was no market at that port for her cargo, landed a quantity of mackerel to secure the payment of the port dues. Upon hearing that there had been a fire at Guayama, a port of the same island, eastward of Ponce, the vessel proceeded thither, and having sold a part of her cargo, and received on board a part of the return cargo, returned to Ponce, sold the residue of the outward cargo and completed the return cargo. On the homeward voyage to the United States, she was lost. It was *held*, that the receiving the mackerel on board at St. Thomas and landing it at Ponce, was protected by the policy; that even if the vessel was unseaworthy on the voyage from Ponce to Guayama, on account of her landing the mackerel at Ponce, this did not discharge the insurers from their liability, as the defect was cured before the loss; and that the return to Ponce for the purpose of disposing of the residue of the outward cargo, and completing the return cargo, was not a deviation.

Deblois
 v.
Ocean
Ins. Co.

*Where an injury is sustained by a vessel insured under a valued policy, the loss is not total unless the expense of repairs will exceed fifty per cent. of the valuation in the policy, after the deduction of one third new for old.*

THIS was assumpsit on a policy of insurance, dated February 11, 1832, by which the defendants insured the sum of $6000 on the brig Pedler, valued at $6000, "at and from Boston to St. Thomas and a market in the West Indies, and at and from thence to a port of discharge in the United States. Premium 2½ per cent; to add one fourth per cent. if to more than one port." The writ was dated December 8, 1832; and the plaintiffs claimed for a total loss.

At the trial, before *Wilde* J., it appeared, that the vessel arrived safely at St. Thomas, although she was rather crank on her passage; that she there landed about one third, in weight, of her cargo, consisting of cordage and other heavy articles, which were taken on freight for that port; that the master purchased there, at a low price, eighty or ninety barrels of No. 3 mackerel, which could be taken on board in an hour or two, for ballast; that ballast was necessary to enable the vessel to proceed safely on her voyage; that vessels at St. Thomas bound to leeward, when in want of ballast, frequently take on board mackerel, as the most convenient and speedy mode of ballasting; that it would have taken two or three days to procure stone ballast, it being obtained from the beaches; and that, in point of fact, the vessel was not delayed at all by the purchase of the mackerel and the receiving it on board.

It also appeared, that the vessel sailed from St. Thomas, and proceeded off Ponce in Porto Rico, where she lay off and on, while the master went in the boat to inquire as to the state of the market; that the master was detained there, under the Spanish laws, and compelled to enter the vessel and pay the port dues, although there was no market at that port for the cargo; that in order to secure his consignees, who had become liable for the port dues, he was obliged to land a quantity of mackerel; that upon hearing that there had been a fire at Guayama, a port of the same island, eastward of Ponce, he proceeded thither, sold a part of his cargo, and took in a part of a return cargo on freight for New York;

that he proceeded thence to Ponce, and having sold the residue of the outward cargo and procured the residue of the return cargo, sailed on his homeward voyage ; and that subsequently, by reason of the perils of the seas, the vessel was disabled from prosecuting her voyage, and compelled to put away for Bermuda, where, upon a survey, she was found to be much injured, and was condemned and sold. The proceeds of the sale were $1708.

By the survey, it appeared, that she had been thrown upon her beam ends, and had suffered much sea damage ; that five feet of water had got into her hold and had melted some of the sugar with which she was loaded ; but that her main hatch was well secured and the sugar there was dry. It was estimated by the surveyors, that the expense of repairing the vessel would have been $3798. The vessel was duly abandoned to the defendants on July 23, 1832, upon the receipt of the intelligence of her loss ; but the abandonment was not accepted.

The defendants contended, that the taking in the mackerel at St. Thomas, and selling it at Ponce, was a trading from port to port, and so was a deviation ; and that the return to Ponce was not within the protection of the policy. But the judge ruled otherwise.

The defendants also contended, that if the taking the mackerel on board at St. Thomas was necessary, the discharging it at Ponce rendered the vessel unseaworthy on the voyage from Ponce to Guayama, and so avoided the policy. The judge thereupon ruled, that this was a question of fact; and that he should instruct the jury, that the vessel was not necessarily rendered unseaworthy by the fact above stated, but that it must depend on all the circumstances.

The defendants then contended, that the surveyors' report and estimate did not show, that the vessel could not have been repaired at a cost not exceeding fifty per cent. of her value, as inserted in the policy. The plaintiffs insisted, that the survey and report did show, that the vessel could not have been repaired, except at a cost exceeding fifty per cent. of her value at the time, which they contended was the true test, to determine whether the loss was total or not.

Deblois
*v.*
Ocean
Ins. Co.

A verdict was taken, by consent, for the plaintiffs, subject to the opinion of the whole Court.

If the Court should be of opinion, that the taking the mackerel on board at St. Thomas, or the return to Ponce, avoided the policy, or that the rulings of the judge were wrong, or that the survey did not show a total loss, according to the principles of law, the verdict was to be set aside, and a new trial granted ; otherwise judgment was to be entered on the verdict, which was for a gross sum, as for a total loss, deducting the salvage.

*March 9th.*

*Peabody,* for the defendants, to the point, that the taking the mackerel on board at St. Thomas necessarily caused a delay at Ponce where it was landed, and that this was a trading from port to port, and so a deviation and not protected by the policy, cited *Sheriff* v. *Potts,* 5 Esp. R. 96 ; *Stilt* v *Wardell,* 2 Esp. R. 610 ; *Raine* v. *Bell,* 9 East, 195 ; *Cormack* v. *Gladstone,* 11 East, 347 ; *Laroche* v. *Oswin,* 12 East, 131 ; *Maryland Ins. Co.* v. *Le Roy,* 7 Cranch, 26 , to the point, that it was for the Court to decide whether the discharging the mackerel at Ponce rendered the vessel unseaworthy on the voyage from Ponce to Guayama, *Law* v. *Hollingsworth,* 7 T. R. 160 ; Hughes on Ins. 265, note ; and to the point, that the return to Ponce was a deviation, there being no liberty given in the policy to go to the same port more than once, Hughes on Ins. 168, 183, 184 ; *Elliot* v. *Wilson,* 4 Bro. P. C. 470 ; *Tait* v. *Levi,* 14 East, 481 ; Phillips on Ins. 179 ; *Coffin* v. *Newburyport Mar. Ins. Co.* 9 Mass. R. 436 ; *Kettell* v. *Wiggin,* 13 Mass. R. 68 ; *Robertson* v. *Columbian Ins. Co.* 8 Johns. R. 491 ; *Maryland Ins. Co.* v. *Le Roy,* 7 Cranch, 26 ; *Mellish* v. *Andrews,* 16 East, 312 ; *Stocker* v. *Harris,* 3 Mass. 409 ; *Solly* v. *Whitmore,* 5 Barn. and Ald. 45 ; *Maxwell* v. *Robinson,* 1 Johns. R. 333 ; *Gairdner* v. *Senhouse,* 3 Taunt. 16.

*C. G. Loring* and *Bartlett,* for the plaintiffs. The taking the mackerel on board at St. Thomas and landing it at Ponce, was not a deviation, because the mackerel was required for ballast. But even if it was not necessary, still as it occasioned no delay, it was protected by the policy. *Chase* v. *Eagle Ins. Co.* 5 Pick. 51 ; *Thorndike* v. *Bordman,* 4 Pick

471 ; *Urquhart* v. *Barnard*, 1 Taunt. 450 ; *Raine* v. *Bell*, 9 East, 195 ; *Houston* v. *New England Ins. Co.* 5 Pick. 93. The landing of the mackerel at Ponce was compulsory, and for this reason would not affect the liability of the defendants.

The unlading of the mackerel at Ponce, without taking on board any ballast in its stead, did not discharge the insurers from their liability ; for the voyage from Ponce to Guayama is inland and may be performed without ballast, and the vessel was rendered seaworthy for a sea voyage before the loss.

The return to Ponce was not a deviation.    The vessel did not go there the first time in the regular prosecution of her voyage, but was compelled to enter by the government. Besides, this was clearly a *seeking* voyage, without any fixed *terminus* in the West Indies ; and it was not necessary to proceed in the geographical order of the ports.    As a general rule, the vessel should proceed in the natural order of the ports ; but this rule does not apply where the *scope of the voyage*, as in the present case, requires a different course. *Metcalfe* v. *Parry*, 4 Campb. 123 ; *Lambert* v. *Liddard*, 5 Taunt. 480 ; *Mellish* v. *Andrews*, 2 Maule & Selw. 27.

PUTNAM J. delivered the opinion of the Court.    We proceed to consider the validity of the points made in the defence.

1. That the taking in the mackerel at St. Thomas and disposing of it at Ponce, was a trading from port to port, and so not within the protection of the policy.

2. If not so, and if it were taken on board as ballast, yet as it was taken out at Ponce, and no ballast put on board, the vessel was not seaworthy in the passage from Ponce to Guayama.

3. That the return to Ponce to complete the voyage was a deviation, inasmuch as there is no liberty given in terms to go backwards and forwards, or more than once to the same port.

4. If the defendants are liable at all, it is only for a partial loss.

As to the first objection, we think that the taking in the mackerel was lawful, for two reasons : 1. because there was no delay, increase or variation of the risk occasioned thereby ;

*March* 16

and 2. becasue it was wanted for ballast, after a considerable part of the outward cargo had been unloaded there, and the vessel was rather crank on her outward passage.

As to the second objection, going from Ponce without replacing any ballast for the mackerel which was taken out there, we do not think the evidence in the case is sufficient to warrant a verdict of unseaworthiness on that account. The voyage from Ponce to Guayama is an inland navigation, which for aught that appears might be safely performed by the Pedler without taking in any more ballast.

But there is another answer. If it were not proper to make that passage without more ballast, yet it was no breach of the original implied warranty of seaworthiness, but a neglect to keep the vessel in that state. And if she had been lost in consequence of such neglect, the defendants might have availed themselves of that neglect. But she made the passage in safety. The defect, if there were any, was cured. For it is not suggested that she was not in good sailing trim, when she left the West Indies upon her returning voyage to the United States.

The validity of the third objection, will depend upon the true construction of the policy. The voyage or risk is described, "from Boston to St. Thomas and a market in the West Indies, and at and from thence to a port of discharge in the United States. Premium 2½ per cent., to add one fourth per cent. if to more than one port." This is what is called a West India voyage. The object is obvious, viz. to get the outward cargo to a market, and to procure a return cargo. She proceeded to St. Thomas, the first port named in the policy. If there were no market there, she might go from thence to any port in the West Indies for a market, and to effect that object, it seems to us to be very clear, that she was not confined to any order, but might look to the expected profit to be made, rather than to the geographical position or convenience of visiting the several islands in the West Indies.

It would unquestionably be otherwise if the West Indies were between the termini of the voyage, and the vessel had liberty to touch and trade on her passage. In such case she must take the ports in their convenient and geographical order.

so as to make as little deviation from the direct course as could be reasonably expected. We must constantly bear in mind, that the vessel was seeking a market. Suppose that her cargo was lumber, and that after leaving a port where there was no demand for it, that place should be destroyed by fire, and the news should be received at another port, we can see no reason, why she might not return to the first port, where, in consequence of the fire, a most advantageous market might be procured for the cargo. The words, *and a market*, seem to us necessarily to confer the liberty of returning to a port, once and again, if such return were with the honest intent to find a market. In *Maxwell* v. *Robinson*, 1 Johns. R. 333, upon a policy "from New York to Barbadoes and a market," it was held, that the vessel might *bonâ fide* go from island to island until her whole cargo should be disposed of. So long as the vessel was seeking a market in the West Indies, it seems to us clearly, that she was within the protection of the policy ; clearly within the words and spirit of the contract.

But we think that the counsel for the defendants are right upon their fourth point, viz. that they are liable only for a partial loss, if liable at all.

Upon this point, the counsel for the plaintiffs contend,

1. That if a vessel is so far a wreck, that she cannot be repaired, except at a cost exceeding her value, the loss is total, without abandonment. *Gordon* v. *Mass. F. & M. Ins. Co.* 2 Pick. 249 ; 2 Phillips on Ins. 279 ; Hughes on Ins. 384 ;

2. That this value is to be settled at the *time* and *place* of the wreck, even in a valued policy. *Peele* v. *Merchants Ins. Co.* 3 Mason, 27 ; 2 Phillips on Ins. 287 ; and,

3. That the above are the general rules of law, and are not altered by the form of the Boston policies, except in a case where *abandonment is necessary* to make a total loss, when the value in the policy governs ; and that in this case the assured did not claim under an abandonment, nor for a constructive total loss, but for an *actual total loss*.

Now it is a fixed rule, that if the ship be injured by the perils insured against, so as to require repairs to the extent

of more than half her value, the insured is entitled to abandor as for a total loss. *Peele* v. *Merchants Ins. Co.* 3 Mason, 27 That position of the eminent judge of the Supreme Court of the United States for this circuit, is proved by the many au thorities cited to that point. This rule will be found among the principles of the law of insurance embodied by *Parson:* C. J., in a most learned opinion, in the case of *Wood* v. *Lin- coln & Kennebeck Ins. Co.* 6 Mass. R. 479. He cited very few authorities, but the opinion is well supported in the books One point which he suggested was new to many eminent ju rists, viz. that the underwriters, under certain circumstances may undertake to recover the property at their own expense for the owners. This is thus stated in Weskett, *tit. Aban donment, p.* 7, § 22, from Valin, 133; "The insurers may take such measures for recovery as to them may seen good." Everybody knew that the assured had that right but I believe that Chief Justice *Parsons* was the first Amer ican judge who recognised that most reasonable principle in regard to the underwriter. It had a direct application to tha' case. As light and spongy fabrics are reduced to portable size by hydraulic pressure, so the verbose readings of the law were, by the force of his great mind, reduced to clear practical rules. That opinion is one among many, in which this power of compression and discrimination, is eminently conspicuous.

The case (*Peele* v. *Merchants Ins. Co.*) in 3 Mason, 27, was the case of the ship Argonaut, which was litigated for years under circumstances of considerable excitement. It was at first brought before this Court. Afterwards it was sustained under the admiralty jurisdiction of the court of the United States for this circuit, and a decree was made for the plaintiff; accompanied with a most elaborate and learned argument in support of the decree. An appeal was taken to the Supreme Court of the United States, and it is believed, that the ad- miralty jurisdiction was not sustained. At any rate the case appeared again in our Court. And it was tried repeatedly ; and the law was ruled according to the case of *Wood* v. *Lin- coln & Kennebeck Ins. Co.* so far as that case applied ; which in many respects was not conformable to the views of the

presiding judge of the United States court for this district. Indeed I may now say, and with perfect respect to my very distinguished friend who pronounced that decree, that this Court has entertained opinions in regard to the law of his case, essentially at variance with the opinions expressed in his elaborate argument. At the last trial in this Court, the cause went off upon a fact not involving any disputed legal principle. So that it has not been necessary for this Court to revise the rulings in matter of law, of the judge who tried the cause. Whenever any point has arisen in subsequent causes, which was involved in the case of the Argonaut, it has been declared, as in *Hall* v. *Franklin Ins. Co.* 9 Pick. 466, that the assured has no right to abandon because the ship is in imminent danger of being totally lost. And in the cause at bar, we are obliged to declare the law applicable to this case as it was understood and declared in the case of the Argonaut.

In the case at bar, the opinion of the learned judge of the United States court in the case of the Argonaut (3 Mason, 27), is urged upon our consideration. But we cannot yield to its reasoning. This is no time for a connected view of the law which this Court entertain in regard to that case. We certainly have no disposition to volunteer on the subject. But when points come up for consideration, which were ruled in that case, and in which the Court are agreed, they will be decided according to our understanding of the law.

It became necessary for the judge of this Court who tried that cause, to decide whether the value of the vessel as she lay upon the rocks, or the value as mentioned in the policy, should be taken, in order to ascertain the legal rights of the parties; and also, to decide whether one third new for old should be deducted from the expenses of repairing the damage, in order to determine whether a technical total loss had happened. These points had not before been brought expressly before the Court. The presiding judge was of opinion, that the value named in the policy should be taken as the true rule, and that one third new for old should be deducted. And after much consideration of the cases cited in 3 Mason, 27, and of the acute reasoning of the learned judge, there to

be found, and of other cases which have been seen since touching that point, we are all of opinion, that the ruling of the judge of this Court was correct. In regard to the value, we must recollect it was fixed by the agreement of the parties. So it was in the case at bar. It is admitted that if the vessel were absolutely lost, when returning to her home port, after a three years' voyage and essential deterioration, the value in the policy should be paid. And we cannot perceive any good reason why that value should not govern, as well when the assured claims for a technical total loss, as when he claims for a loss by the total destruction of the ship; and why it should not govern when the assured would lose, as well as when he would gain by it. It seems to us, that we should have just as much right to set aside the valuation if the vessel should be burnt or otherwise actually destroyed, when she had deteriorated in value, as to say that it should be set aside in the decision of the question, whether or not a technical total loss had happened. If in the case of the utter destruction, the underwriters would not be permitted to prove, that she was not worth half as much when she was lost as when the voyage commenced, why should the assured be permitted to prove that she had deteriorated to that extent, in order to make an abandonment as for a technical total loss, which could not be otherwise maintained? It would, we think, be making a new contract, which would be essentially deficient in point of mutuality. If the vessel sustained damage at a time when she was in great demand, the owner would repair her. If at a place where there was an embargo, and where vessels were in comparatively little value, then he would work up the repairs to more than half her value in the market there, claim for the whole, and throw the vessel upon the underwriter. Wreck or not, total or partial loss, would depend upon the ever-shifting state of the market, and not, as it should, upon the condition of the ship. She might be almost worthless at the place where she was damaged, and in another and perhaps not a distant port, would sustain a fair and reasonable value. It was to avoid these and other uncertainties and causes of litigation and dispute, that the parties agreed upon the valua tion in the policy. It was to continue the same, although the

vessel should grow worse. It was to continue the same wherever she might go under the policy, although she might in some places be worth more and in some places less than the value agreed upon. It was to be coextensive with the voyage as to time and place.

And in regard to the deduction of one third new for old, we think there is just as good a reason to apply the rule to the consideration, whether or not there was a technical total loss, as there is to apply it to a partial loss. In the latter case it has been long settled, is uniformly applied, and generally works well. We know that the Supreme Court of New York, in *Depuy* v. *United States Ins. Co.* 3 Johns. Cas. 182, held, that " the rule that the insured may abandon where the repairs exceed half the value, is *general*, and has no reference to the distinction of one third new for old." It was an opinion *per curiam*, and no reasons are given. But this point came expressly under the consideration of the Court of Errors in New York, in *Smith* v. *Bell*, 2 Caines's Cas. 153, where the majority of the Court of Errors concurred with the opinion of *Lansing* C., that to constitute a technical total loss of a ship by the perils of the sea, she must be injured to the amount at least of half her value after deducting one third new for old. This is a practical rule, of the utility of which merchants and underwriters may perhaps be as competent to decide as judges are ; and it may not be amiss to observe, that it has been introduced into some, if not all, of the Boston policies.

Judges would be influenced, without doubt, by the consideration, whether abandonments for technical total losses ought to be favored or restricted. We are among those, who think that this part of the law of insurance, as it now is administered, is a clear departure from the great principle of indemnity upon which the contract of insurance should rest. According to the original intent surely, the underwriters were to pay the damage, the actual loss. They were not to become ship-owners, brokers, or merchants. This idea was expressed by *Buller* J., one of the most eminent judges of England, about fifty years ago. *Mitchell* v. *Edie*, 1 T. R. 615. We must decide the law as we now find it. But

where a construction is to be made, in the absence of binding authority, we prefer that which restrains, rather than that which enlarges the right to make a technical total loss. According to our rule, no injury will be done to the assured. He will have his indemnity for the actual loss, according to the established principles of insurance.

We hope that in this State it will be considered as settled, that the value in the policy is to govern ; and that a deduction of one third new for old is to be made in regard to technical total losses, as it is made in regard to partial losses. If after such deduction the expenses of repairs exceed one half of the value in the policy, the assured may abandon, and claim as for a total loss ; otherwise he is to keep the ship and recover for a partial loss only.

And we think that the rule will operate beneficially, for the assured are generally more competent to manage the property that remains, than the underwriters can be.

This view of the case disposes of the objections of the plaintiffs' counsel to the fourth point made by the counsel for the defendants. For if the damage would not amount to one half of the value of the vessel, to be ascertained as is before stated, it would follow conclusively, that the ship was not such a *congeries* of planks, as *Abbott* C. J., in *Cambridge v. Anderton*, 2 Barn. & Cressw. 692, describes a mere wreck to be. That suggestion is utterly contradicted by the facts found in the survey. The vessel was not stranded ; she had suffered much sea damage ; she had been thrown upon her beam ends ; four or five feet of water had got into her hold, and melted some of the sugar. But it is found that her main hatch was well secured ; and the rest of the cargo of sugar was dry. The injury therefore was not such as to make her a wreck, in such a sense as to entitle the plaintiffs to recover without abandonment. If, as is admitted, it were not to an amount sufficient to constitute a technical total loss, *a fortiori* it could not be considered as an absolute destruction.

According to the agreement of the parties, a new trial is granted.