Putnam J.
delivered the opinion of the Court. It is very clear that the survey is not evidence of itself to be given by the plaintiffs, unless the defendants should call for it.[1] It is ex parte, and the defendants had no opportunity to cross-examine. Saltus v. Commercial Ins. Co. 10 Johns. R. 487 ; Abbott v. Sebor, 3 Johns. Cas. 46. In the case at bar the defendants objected, but their objection was overruled. So there must be a new trial for that reason.
There was also no satisfactory evidence that the survey was *486 under oath ; for the certificate, — “ Done before me, R. IitzPatrick, notary public,” — does not necessarily import that the ■ surveyors were sworn to their survey. ‘There is some inference to the contrary from the separate certificate of Otis, one of the surveyors, that he believes the repairs would cost the sum in his estimate. The other two say no such thing.
It is not intended to enlarge the authority of the master to make sale of the vessel beyond the rule laid down in Gordon v. Mass. F. & M. Ins. Co. 2 Pick. 262. It must oe confined to “ a case of extreme necessity, and where he acts with the most perfect good faith for the interest of those who are concerned in the property.” There must be something more . than expediency in the case; the sale should be indispensably requisite. The reasons for it should be cogent. We mean a necessity which leaves no alternative; which prescribes the law for itself, and puts the party in a positive state of compulsion to act. The master acts for the owners or insurers, because they cannot have an opportunity to act for themselves. If the property could be kept safely until they could be consulted, and have an opportunity, in a reasonable time, to exercise their own judgment in regard to the sale, the necessity to act for them would cease.[1]
In the case at bar, the vessel was in a good harbour; she was tight, although she had struck upon the ground or rocks ; and she had good ground-tackle. For aught that appears, she might have remained at anchor in good safety until the master could have communicated with the insurers. In thirty or forty days they might have had a special agent upon the spot. The damage, which the vessel had sustained, was at most a technical or constructive total loss. Why then should the underwriters be deprived of the election to sell the ship there or to send her elsewhere to be repaired ? The only additional expense would have been the wages of one or more ship-keepers *487 to remain on board until the underwriters should have determined to accept or. reject the abandonment, and that expense must, according to the terms of the policy, have been borne by the insurers. Then what color of necessity was there for the master to sell the ship, without consulting with the insurers ? He sent to New Orleans, where a majority of the owners re7 sided, and waited until one of them arrived at Key West. This shows conclusively, that there was no pressing necessity for an immediate sale. There is no reason to doubt that the vessel would have remained there in safety, while a communication could be made with the underwriters in Boston. If she had in the mean time been burnt or otherwise destroyed by any perils assumed by the insurers, the loss would have fallen upon them.
And there was no immediate necessity to sell the ship to raise money to pay the salvage. For there would have been considerable delay, before an application could have been made to the admiralty court, which was held at the distance of 300 miles; and before an order of sale could have been obtained from that court for the sale, the owners could have been con-suited and have had an opportunity to make provision for the salvage. Besides, if there had been a judicial sale without any default of the master or owners, after notice to the insurers and before they could have interposed, the loss would be borne by them. The duty of the master would seem to be clear, to hold on, and preserve the property in safety so long as he could, for the benefit of all concerned.
But the master was not driven to such extremity. He was enabled to communicate with the owners, who were represented on the spot in ten or twelve days. Then it became their duty to pay the salvage, or to abandon, and throw the loss upon the underwriters, if a judicial sale should have been made before they could have received notice and interfered to pre vent it It became then the bounden duty of the master and owners to give the insurers an opportunity of managing the concern as they should think for their interest. But the master, having advised with the owners, undertakes to make the sale by auction, on the ground of necessity. Now we think it clear that the owners, who became the purchasers, did not buy under *488 the belief or expectation of repairing the ship at the port of distress ’ taking it for granted that the cost of repairs there would have amounted to the sum estimated by the surveyors. They must have purchased with a view to carry the vessel to some other port to be repaired. Why should the underwriters be deprived of that advantage, if they are to be held for a total loss ? It cannot be pretended that this vessel was a wreck ; that she was to be considered valuable merely for her timber and her materials, as if she were broken up, and sold in lots. The facts will not admit that view of the case. She was sold as a ship, riding at her anchor, without any leak, notwithstanding she had grounded. There is no evidence that the purchasers intended to break her up there. They gave much more than the mere unconnected materials of the ship would have been worth. She was within a week’s sail of the port of New Orleans, where, according to the evidence, she could have' been repaired at much less than fifty per cent of her valuation. And if she proceeded to some northern ports, she would be repaired at a less expense than at New Orleans. The purchasers knew these facts. If she had proceeded to a port for repairs, she would have sailed at the risk of the insurers. It would have been a-voyage of necessity, and not a deviation.
But it has been contended, that there was imminent peril in that voyage, which the purchasers might be willing to sustain for their own account, but which they were not bound to take for the insurers.
The peril was to be estimated from the facts which they then knew. They knew that the ship had been thumping upon the rocks, but that after all she remained a tight ship. They did not know the extent of the damage, as they did after she was hauled upon the rail-ways. The transaction speaks a language which cannot be misunderstood. The purchasers, under the circumstances, had reason to think, that they could nav gate the ship to a port for repairs ; if it had been otherwise, they would not have trusted themselves in her. Life is not held so cheap. If the owners might be willing to incur extra hazard, no such inducement could operate upon the master. Yet he went in her upon the voyage to Boston, without making any repairs. The subsequent events proved that they judged cor *489 rectly, for she encountered very bad weather, lay too in a gale for three days without leaking much, and in short, she performed the voyage well.
In Milles v. Fletcher, 1 Doug. 231, where, insurance was made on a ship and freight from Montserrat to London, and the ship was captured and recaptured and carried to New York, the whole voyage was lost. Part of the cargo had been taken out, some of it was washed overboard, and the rest was damaged and in a perishable state. It was in 1779, during the revolutionary war ; the crew were gone ; no sailors were to be had. The ship could not proceed in the state she was in. She was captured in May by American privateers, and part of her cargo and all her crew taken out of her. She was recaptured afterward, and arrived in June at New York, where there was an embargo until the 27th of December. The ship was leaky, and could not be repaired without unloading her, and she should have arrived in London in July. And the captain had no means of paying the salvage but by sale of part of the cargo or the ship. He did not know of the insurance. Under these circumstances he contracted for the sale of her ; but the purchaser ran away, and she was left in a creek in New York, and the master returned to London, and there the plaintiff seasonably abandoned.
The facts in that case are totally unlike those in the case at Bar. In the latter, the voyage was not lost, for the cargo was sent forward to the port of destination. The ship did not leak; seamen might have been procured ; the assured were present. In Milles v. Fletcher, there was abundant ground to call for a total loss by reason of the damages which followed from the capture, without the sale by the captain. In the case at bar, his sale is considered as the basis of the claim for a total loss.
The case of Idle v. Royal Exch. Ass. Co. 8 Taunt. 755, has been urged for the plaintiffs. The insurance was upon freight and cargo from Quebec to London. The ship sailed on the 16th of November, 1810, and having struck the ground and being thereby rendered leaky, she was necessarily run on shore upon the outside of a reef of rocks about ninety miles below Quebec. She lay in a situation of imminent peril of being carried away and destroyed by the ice. She was in the *490 tide way, and immovable, .exposed to the full force of the ri\ er St. 'Lawrence. The master, under the direction of one who was part-owner and agent for the other owner of the ship, sold the ship and cargo at Quebec. The ship, contrary to all expectation, survived the danger, and in the spring of 1811 was floated and carried to Quebec and repaired. The master acted in good faith. The case was tried in the Common Pleas, upon a special verdict stating the facts, and the underwriters were held to be chargeable. Dallas, C. J., in an able review of most of the cases upon this subject, gave the opinion. But a writ of error was brought, and when it came on for argument in the King’s Bench, the court expressed a clear opinion, that the necessity of the sale did not appear from the finding of the jury; and a venire de novo was awarded, to try whether it existed or not. The cause was finally settled by the parties, without a further trial. Vid. 3 Brod. &. Bing. 151, note to the case of Read v. Bonham.
Now it is not easy for us to perceive the necessity in that case, for the master to sell the ship under those circumstances. She was unquestionably in very great danger of being broken to pieces by the immense quantities of ice floating in the river, but the purchaser took and held her subject to the same peril. Her value at auction was diminished accordingly. The purchaser had no means of preservation which the master might not have applied. Indeed she was in such a situation, as rendered all aid unavailing during the winter. If she survived it, the purchaser would probably make a very good bargain. If she went to pieces, he would expect to lose the small sum to be paid for her. The sale did not diminish the risk at all. Will it do to say that the master has authority to get a reinsurance for the underwriter, when imminent danger of loss is threatened ? If he does, he must pay the adequate premium, and how is the underwriter to be benefited ? If the purchaser were in a better situation than the master to preserve the property, there would be some reason for the sale. For example, if the insurance was upon a cargo of fruit or other perishable goods, and a good market could be found for its immediate use, 't would be better to sell, than to keep the cargo on hand to Tot.. But where the subject matter of the sale continues in the *491 bands of the purchaser, exposed to the same hazard as if it had remained at the risk of the underwriters, they are not relieved or benefited at all by the sale ; because the property is sold subject to the pending and threatened calamity ; and underwriters are willing to take great as well as small risks, for adequate premiums. We see no necessity for shifting the risk from one to another, under such circumstances. If there were a good cause for abandoning as for a constructive total loss, the ■ship, under such circumstances, should have been left for the underwriter. The hope of recovery was worth as much to him as to the purchaser. The master has no authority to interfere on the ground that in his opinion he can obtain something more than the spes recuperandi is worth.
And besides these considerations, there is, from the evidence, .much reason to doubt whether there was a real sale with intent to change the property. On the contrary, there is great reason to believe that it was a formal measure, resorted to merely for the purpose of ascertaining the amount to be paid for salvage : the arbitrators having awarded thirty-three and a third per cent of the net proceeds of the sale of the brig, as the compensation to the wreckers. The consideration has never been paid to the master. It has only entered into the accounts at New Orleans between Merle & Co. and others ; how settled, does not appear. And the salvage was paid by Howard, and not by* the master. In short, it looks more like taking the brig into the possession of Howard for the account of the owners, after having paid the salvage, than as a real sale of the master to a bond fide purchaser.
In every view of that part of the case, we aré of opinion that there was not sufficient evidence óf such a sale and transfer of the vessel as devested the interest of the owners. They cannot, under such circumstances, recover without an abandonment.
But it is contended further, that there was a technical total loss at Key West; first, because the repairs should have been made there, and would have cost more than fifty per cent ; and secondly, if they would not have cost fifty per cent, yet that I In vessel was in such imminent danger as to justify the abandonment.
*492 We cannot yield to the argument, that the repairs should be made at the place or port where the injury was received, if there are no reasonable means of making them at that place, and the vessel can safely be navigated to a port where the repairs can be made, so as that the whole expense will be less than fifty per cent. It would in such a case be the duty of the master to navigate the ship to the port where she might be repaired, and not incur the expenses of bringing men and materials from other ports to the ship.[1] It is in vain to say that the vessel was in such a condition as not to be safely navigated to some other port. We are not therefore to regard the cost of repairing at Key West, but at the place where the repairs were made. The gross amount of the bill at Boston was something less than $ 4000, and the value in the policy was $ 10,000 ; so the damage did not amount to a technical total loss.
The second ground suggested has never been sustained in this Court, and we should be very slow to believe in its correctness. The assured would abandon, not because even a technical total loss had happened, but because there was imminent danger that it would happen.[1] This doctrine would seem to be a departure from the letter as well as the spirit of a contract of indemnity. It is pregnant with uncertainty and litigation. The contract is, to pay after proof of loss ; the version or construction is, to pay after proof of imminent danger of loss. The underwriters engage to pay and indemnify for the loss sustained, and not because a loss is threatened.
The real state of the facts at the time of the abandonment is to govern ; but that is to be ascertained from subsequent examination. The information may be of such damage as would render it expedient to abandon, but if it should prove incorrect and overstated, the abandonment would not avail.
But the facts in the case at bar do not call for an elaborate examination and decision of that point; because, on the day when the Delta was abandoned, she was sailing upon her voy age from Key West to Boston in good safety, instead of being in imminent danger of destruction.
*493 A.nd upon examining the policy in this case, the construetion which has been suggested by the plaintiffs’ counsel is expressly excluded by the provision, “ that the assured shall not have a right to abandon the vessel for the amount of the damage merely, unless the amount which the insurers would have to pay under an adjustment as of a partial loss, shall exceed half of the amount insured.”
The opinion of the Court is, that the plaintiffs are not entitled to recover for a total loss ; that the verdict shall be set aside, and the case be committed to auditors, according to the agreement of the parties, which is on file, to ascertain the damages as upon a partial loss; and that the judgment shall be hereafter rendered accordingly.

 See 2 Philips on Ins. 439. But see Robinson v. Clifford, 2 Wash. C. C R. 1.

 See The Brig Sarah Ann, 2 Sumner, 206; Bryant v. Commonwealth Ins. Co. 13 Pick. 543; Winn v. Columbian Ins. Co. 12 Pick. 279; Petapsco Ins Co. v. Southgate, 5 Peters, 623; 3 Kent’s Comm. (3d ed.) 173, note c; The Schooner Tilton, 5 Mason, 476, 477; American Ins. Co. v. Center, 4 Wendell, 45; Gordon v. Mass. F. & M. Ins. Co. 2 Pick. (2d ed.) 262, note I, and cases cited; Meto England Ins. Co. v. Brig Sarah Ann, 13 Peters 387; Peirce v. Ocean Ins. Co. 18 Pick. 88.

 See Orrok v. Commonioealth Ins. Co. 21 Pick. 466.

 See Deblois v. Ocean Ins. Co. 16 Pick. 311.