## JEFFCOTT v. ÆTNA INS. CO.

District Court, S. D. New York.
June 30, 1941.

See, also, D.C., 32 F.Supp. 409.

Carpenter & Stevenson, of New York City (George C. Sprague, John T. Carpenter, and Allan A. Baillie, all of New York City, of counsel), for libellant.

Bigham, Englar, Jones, & Houston, of New York City (D. Roger Englar, Leonard J. Matteson, George S. Brengle, and Charles A. Van Hagen, Jr., all of New York City, of counsel), for respondent.

CLANCY, District Judge.

On September 21, 1938, the libellant owned the yacht "Dauntless," the hull, tackle, rigging, etc., of which were in-

sured against perils of the sea in one policy of the respondent and disbursements thereon similarly insured in another. She was laid up out of commission at the Thames Shipyard at New London, Connecticut. A devastating hurricane struck New London in the afternoon of that day. It caused a great rise in the water of the Thames River which was referred to by many of the witnesses as a tidal wave and which broke the "Dauntless" from her moorings and carried her to a point more than five hundred feet away where she grounded on hulks of sunken barges and on the river bottom. Subsequently, she filled with water and the condition of her hull, deck, rigging and furnishings were such that seven days later the owner notified the respondent that he elected to abandon her and claimed the full amount due under both policies. The yacht's deck and her interior walls, which were panelled in fine and costly woods, had been ruined, her Diesel motor and auxiliary motor and all the electrical equipment had been submerged as had her rigging, and the furniture and linen furnished an additional basis for a claim of damage. The "Dauntless" was not salvaged until the 17th of November when the respondent took her off and returned her to her berth at the pier.

The yacht had been left in the care of one Schmidt, her chief engineer, and he and his wife were the only persons aboard when she stranded. His testimony was that when the boat went adrift he was below blinding the ports and that he first recognized her situation when he looked out and could not see the boat which had been moored on the other side of the dock. He felt no collision and was unaware that the boat actually had stranded. He testified that he left the boat dry on the night of the hurricane and returned after sunrise the next morning which we will fix at about after six o'clock; that water then filled the aft part of the boat, below the cabin deck and including a compartment called the lazaret in the stern. In the engine room compartment, which is midships, he found only one foot of water at its aft end. He started pumping with the bilge pump and took the suction out of the engine room with it. While it was operating he went through the boat and discovered water in the lazaret. He breakfasted on another boat and when he returned he found the bilge pump had stopped. The electrical equipment revealing no apparent fault, he dropped that pump and, as the water in the room had gained, he started a forward bilge pump. But noticing the water still gained he pulled the plugs from the switchboard and went ashore to obtain a pump at the shipyard. At noon he obtained a lighter which had a pump but necessary repairs delayed its action until two. By that time the water had risen through a hatch in the deck of the owner's cabin and was two feet above the floor of that room. The suction pipe of the pump was six inches in diameter and the pumping continued until six or seven o'clock that night in the trunk room, lazaret and companion way on the port side of the owner's cabin and when they knocked off, the water was two feet below the cabin floor and the water was pretty well cleaned out of the lazaret. That night watchmen were left on the "Dauntless" but Schmidt slept on the "Oceana". When he returned the next morning, he found the water had regained almost the height to which it had risen on the previous afternoon. The lighter pump resumed operation and the water was reduced as far as its hose would reach, when it was requisitioned for another job. This is all the pumping that was done on the vessel. The following morning, the water had risen to the top of the trunk room hatch and in the engine room had risen to a height of four feet submerging the engine. It is apparent from this recital that the water in the hull of the "Dauntless" flowed back and forth through the hull with considerable freedom while her position changed due to her sinking in the river bottom under her stern and upon the barges which were under her bow. The vessel was bulkheaded from her stern forward as follows: One bulkhead separated the lazaret at the stern from the rest of the vessel and this we will call the lazaret bulkhead. The trunk room, forward of the lazaret, was separated from the tank room, which was between it and the engine room, by a bulkhead which we will call the trunk room bulkhead. The one between the engine room and the tank room, we will call the aft engine room bulkhead. There were other bulkheads which will appear to have no importance. Wires of the signal system passed through an inch or inch and a half square aperture in the lazaret bulkhead and through a pipe connection in the trunk room bulkhead. There was testimony which we accept, that the pipe connection was hose tight on tests

made by the examiner for Lloyds. There were sluice valves in the aft engine room bulkhead and in the lazaret bulkhead and the bilge pipe in the trunk room bulkhead controlled by a cock. The sluice valves were about four and a quarter inches by four inches. Schmidt said he kept the engine room bulkhead sluice valve always closed and did not know of the existence of the lazaret sluice valve nor of its control. Respondent's surveyor said that during the operation of pumping he heard the splash of water and, lying on the floor of the cabin, he looked through the hatch and saw a jet of water issuing from the hinge of the trunk room door. First the stream was described by him as about the size of that from a garden hose. When his attention was called to the fact that the watertight door had a rubber gasket and a flange acting as a stop for it on the side toward the hatch through which he was looking, the stream of water became fan-shaped. He said that at the conclusion of the pumping he opened the door in the trunk room bulkhead; that he had to "jump the dogs" in order to loosen them. Cross examination, however, revealed that he had no recollection of when he opened the door and it may have been as late as December 23rd when his first note of the condition of the gasket which he described was made. He said a piece of the rubber had been torn off. On cross examination this decreased in size and found a new position. Both he and his brother surveyor carried cameras while working but no photograph was produced of the place on the gasket from which the rubber had been torn. The attention of nobody connected with the libellant had been called to it during many conferences ensuing thereafter, and we do not believe the surveyor's testimony as to this fault in the gasket. We find no other explanation acceptable for the rapid flow of the water through the hull as the vessel changed its position than that the watertight doors in the trunk room bulkhead had never been closed. We think this conclusion is borne out by the contradictions in Schmidt's testimony which we also decline to accept inasmuch as it is self-contradictory in view of the quantity and ready flow of the water in the hull and contradicted by other credible testimony. When the boat stranded, Schmidt said he was blinding the ports. Before the boat left her dock, he had gone through her and made everything tight and ship-shape; when she stranded, he was busy at blinding the ports. He had his wife aboard and admitted care for her safety. The boat was shivering as a boat in her position, and gradually settling, must; so much so that the men who came to rescue Schmidt as late at eleven o'clock on the night of the hurricane insisted that he hurry off the vessel because they were afraid of her careening. We do not believe that a man in his situation would give much thought or any effort to closing bulkhead doors or to any matter that required his attention below decks under these circumstances and we do not believe that he did. The young man who eventually was put aboard to move the furniture, said he tightened all the blinds and this is borne out by uncontradicted testimony that marks indicating the entry of water into the ports were present in the boat.

The respondent insists that Schmidt told the truth when he said he did not know of the existence of the valves in the lazaret bulkhead which admitted the water to other parts of the boat. It was testified that the control over this valve was in a locker which housed an instrument which Schmidt alone of the crew understood and controlled. This locker gave off a compartment which belonged to the officers and was used only by them. He had been furnished with copies of the original maps showing the structure of the boat. We have already found Schmidt unworthy of belief and we think that his denial of a thorough acquaintance with the lazaret bulkhead sluice valve and its control is of a piece with the rest of his testimony. There is no doubt of his qualifications and long experience as an engineer and we can think of no more competent man whom the owner might have selected than Schmidt who had been his chief engineer when the boat was in commission and who was paid a chief engineer's salary even while she was tied up. Schmidt admitted that he had expressed curiosity to the captain about the possible existence of a valve in this bulkhead. Even after the captain told him, so he said, that he did not know, he never investigated because the lazaret was filled, a statement which we do not credit. Control of and care of the sluice valves was his job and we have no doubt at all that he knew the valve was there and how to control it. He kept it open always of course for drainage, even though it appeared improbable that bilge developed in the lazaret

and we think his omission to close it was quite in keeping with his omission to do anything in the proper care of the boat on the afternoon or evening of the hurricane.

The vessel's rudder had been removed in July. The rudder trunk through which it enters the vessel is at an angle of better than forty-five degrees to the water level and, at its top, inside the vessel, the trunk is oval in shape and about seven inches by five inches. There was a dispute about the height of this orifice in the hull above the water line of the vessel when the vessel was afloat. Respondent's surveyor testified to a calculation which appeared to be exact and which made this distance approximately one foot, but other authoritative testimony developed an error of three and one-half inches in his estimate of the deck's camber, and we find that the top of the rudder trunk was fifteen and one-half inches above water level as the boat was while at her dock. It had been stuffed, by the workmen who removed the rudder, with canvas and burlap. Schmidt testified that on the afternoon of the hurricane he composed a wooden cap for the rudder trunk from a piece of board which he wedged onto its top against some protruding angle irons above. The vessel, at the time, was contracted to be out of commission and docked at New London. There is, of course, traffic at New London but no witness questioned that the burlap and canvas plug was sufficient to keep out any spume or wash from passing traffic and we find the boat entirely seaworthy as a laid up vessel with the rudder out and the canvas and burlap in its trunk. On the day after the hurricane and following the pumping of the lazaret by the lighter, Schmidt and the lighter men manufactured a plug of a piece of spar and canvas which was made to fit and which, while maybe not tight under pressure, apparently served its purpose.

One of the specifications for repair that was not agreed upon by the surveyors was the unstepping and examination of the foremast. About a foot above the deck, on this mast, one of the libellant's surveyors found a crack in the paint and bleeding. Photographs of the libellant indicate that this was quite noticeable at the time Haight first brought it up for discussion. A turn buckle which was a casting on a forestay had been broken and the stay had snapped, indicating a severe impact. The mark on the mast is horizontal near its base and on its front, precisely where an unusual strain on the forestay would be expected to manifest its operation on the mast. There were side stays and a jumper stay which respondent would have us believe would take up any stress applied to the mast by the convulsive contraction of the forestay before it broke but its surveyor was not so sure and we do not agree. We think that any reasonable man, confronted with the evidence constituted of the broken turn buckle and stay and the existence and character of the crack where it is, would have the mast unshipped and examined. So we include such examination in the vessel's damage whether or not fault in the mast actually existed.

A starboard sweep in the stern frame and in the gudgeons thereon was discovered after the boat was hauled. We will not attempt to review or synopsize the evidence about it because it has not sufficed to enable us to form a definite conclusion as to when and where the sweep was incurred and how it was caused and we disallow its remedy as an item of damage. One item of damage is the rigging of the vessel. Most of it, if not quite all, had been deposited in a locker ashore pending the vessel's return to service. The entire locker house was carried by wind and water into the river and left there. We are satisfied that the evidence conclusively demonstrates that a large part of the contents of the locker were submerged daily by the recurrent tides and that all of it was discolored and part of it was devitalized so that the loss of all must be allowed as an item of damage. We find as a fact that the respondent was advised of the location of the rigging on the 28th of September. In respect to the rigging as well as in respect to the water in the vessel we believe that the high water ensuing the hurricane collecting as it did much loose debris and dirt from the land over which it sped and the roiling of the bottom by its rapid outrush made the waters of the Thames muddy and wherever water damage occurred, dirt and discoloration accompanied it. Of course, this was continuous in the case of most of the rigging and it is undisputed and we accept it as a fact that the rigging of a yacht may not be discolored or even lacking in freshness. The water taken through the rudder trunk of the boat developed the additional factor of suction to introduce mud and silt from the river

bed into the hull. At this point, there may well be added that the water in the boat was oily. Indeed, the respondent makes a point that the oily surface of the engine room water acted as a preservative on the engine, and, in view of the free passage of that water through the hull, after its reduction to sluice gate level in the engine room, an oily surface to it in the living quarters of the vessel can hardly be doubted. A disputed item of damage is the winter house which enclosed the vessel while it was laid up. It is a comparatively rough housing substantially watertight made of lumber and in sections. We would take it as normally a part of a yacht's equipment when out of commission as we would the smoke stack of a tramp steamer. The respondent's witnesses, with the exception of its surveyors said so and we conclude it to be a normal and necessary part of its apparel, material and fittings as a fact and covered by the policy as a conclusion.

In computing the damages suffered by the "Dauntless" since only salvage and her restoration to her dock has been completed, we are relegated to expert testimony as a basis for any determination of the cost of repairs. The salvage, of course, is an item. Bradlie v. Maryland Ins. Co., infra; Royal Exch. Assur. v. Graham Co., 7 Cir., 166 F. 32; Jeffcott v. Aetna Ins. Co., D.C., 32 F.Supp. 409. We have deducted from the paid salvage bill all the items claimed by the respondent to be properly allocable to sue and labor, and find the cost of salvage to be $16,447.77.

Specifications of damage were prepared and signed "without prejudice" by surveyors of both parties. Respondent's surveyor testified on the trial that the "without prejudice" clause meant that the survey was not determinative of the respondent's liability for any item but it was a statement of fact of the damages then existing. There is no evidence in this case that any of the damage described in the specifications was caused by any negligence of the libellant after the day of the hurricane. Indeed, there is no evidence that the condition of the vessel or its furnishings deteriorated after the damage suffered then. These specifications were sent to a number of shipyards which were agreed upon and, as is the normal case, the bid prices varied. Libellant proved four of these bids in detail. They were largely made up in the same manner, the individual items composing them having been computed by artisans representing the different trades that would be necessarily engaged. Their estimates, of course, depended upon their judgment which in turn was based on their experience and their knowledge of their own yard's facilities. Their breakdowns were put in evidence. It is difficult to analyze or dispute the testimony of such witnesses about matters of their judgment; their businesses operate in utter dependence on them; their conclusions are largely relative and only the actual operation can prove how far they were wrong, if at all; their facilities and the expertness of their workmen and even of the workers in different departments of each bidder are different, but this is no reason why their testimony should be discarded or even doubted by a judge. We are persuaded that in the absence of any satisfactory effort by respondent to prove any of the bids or any part of them unreasonable or unacceptable, proof of any one would have been satisfactory performance of libellant's duty to bear the burden of proof which we recognize. The respondent's surveyor testified to and put in evidence what he said was a breakdown of the different bids in order to show by obvious comparisons that none of the bids had a firm ground. We have examined and spotchecked this exhibit and we believe it affords no basis for any reasonable conclusion. It attempts to find a standard for a job containing so many items, all interdependent, that there can be no standard. If it was intended to show the repair could be done more cheaply by going from yard to yard to have a bit done here and a bit there, we think the idea ridiculous. Besides, no yard said it would do any specified item for the price set out for it as part of the whole bid. The workmen who testified to libellant's bids all appeared honest and thoroughly familiar with their work and we accept their judgments, different though they be, as their best approximations of the cost that would have been entailed to perform the work required by the specifications.

Respondent, on the other hand, presented the bid of one shipyard. We admitted in evidence the bids of two others but he offered no proof to sustain or authenticate them so that, except as to the fact that such bids were tendered, we give them no importance whatever as evidence of what the required work would cost. The managing owner of the yard referred to and two of his employees appeared on the

stand. Their outright contradictions and the absurdity and futility of the means they claim to have adopted in reaching their conclusions rendered their testimony wholly unworthy of belief. The yard owner himself recognized its futility and felt called on to volunteer an apologetic explanation of his methods. Apart from its falsity, this testimony would not, if accepted, sustain their conclusions of the cost of the repair operations in any respect. We say this about it on its merits, if it has any, but a further defect presented itself. The owner, who said insurance surveyors control the employment of shipyards for work for which they pay, testified that he was unwilling to bid but was finally persuaded to enter the competition by an offer of $10,000 from the regularly employed surveyor of the respondent. This $10,000 was to be paid him to take care of any excess cost that would develop in making the repairs due to the excessive demands which he said were to be expected from the libellant who had once before employed him. The specifications, of course, as does any contract, provided what work was to be done and even for the satisfaction of the owner's inspection and we are unable to recognize any consideration whatever for the $10,000. The offer for this additional money was not divulged to the libellant nor was it intended to be divulged to him. Libellant's counsel referred to this bid as "phoney" and, were we free to adopt his adjective in writing an opinion, we would readily do so as aptly descriptive; indeed, we think it charitable. We refuse to give it any further attention except to reflect that its production leaves a taint on the defense.

For the purpose of deciding the case, we will take the lowest of the four proved bids which is that of Tietjen & Lang plant of the Todd Shipyard Company, in the amount of $114,719, excluding the winter house and examination of the mast. We have already found the winter house an item included within the meaning of the words apparel, materials and fittings insured by the policy. The lowest bid for the construction of the winter house is that of Geo. Lawley & Son Corp., of $5,025.67. We have also found the unstepping of the foremast an item of damage and accept the bid of Geo. Lawley & Son Corp. of $798.67 on this item. For repair of the batteries we find $1,693.32 the reasonable cost. The parties have stipulated that the cost of re-placement of the damaged rigging would be $6,449.40. Respondent contends that the old ropes have a resale value of $1,500 and we are not averse to allowing this as a deduction and find the damage for rigging replacement $4,949.40. To review the testimony on the damage to the furnishings and furniture would be a long and unprofitable task. We find the damage to these items $3,500. We accept the respondent's figure of $174.85 on the contents of the chart room and $116.50 for the materials in the lazaret. We will allow one surveyor's fee; that is, Mr. Laverie's, of $1,200. We think further that a charge should be allowed for owner's supervision of repairs. Both Laverie and Haight testified that it was usual and even allowed four or five percent of the bid price. Despite the completion bond provision and the respectable reputation of the competing yards, we think it an ordinary precaution and one which, in the end, would avoid dispute and procure the proper performance of the work required. There was some testimony that a vessel's captain acted as supervisor of repairs but he would be an unusual captain who would be qualified to supervise the performance of the contract in this case. The work was to last four months, not including the foremast and the winter house, and if surveyors are paid the fees which the testimony in this case has revealed for surveys and supervisory services, we would take $3,500 as a low estimate of the proper allowance for owner's supervision. There is no evidence that Tietjen & Lang included any charge for damages for delay in completion, a fair item in our opinion if they had. While we think that insurance of the vessel during repairs is a reasonable requirement and that such a conclusion was sustained by the testimony that the United States of America has such a proviso in its contracts, we are disallowing it. We can find nothing in the Tietjen & Lang bid fixing the amount included in this item so we have deducted $1,726 which was a broker's advice to one of the witnesses and which seems fair from an apportionment of the libellant's premiums for the policies in this case, allowing for an increase in cost for the intended changed position of the boat. We are deducting this from the bid amount. We are also disallowing the cost of an inspection of Lloyds, looking to the vessel's reclassification. A suggestion by the respondent of a claim of one-third off, new for old, that may be intended to

be conveyed by its brief, is defeated by the language of the policy. We, therefore, find the total cost of the necessary repairs to be $150,399.18. It, therefore, appears conclusively that the cost of salvage and repairs to the "Dauntless" greatly exceeds one half her policy valuation and we award judgment to the libellant as for a total loss. Recurring to the two bids put in evidence by the respondent, but which he made no offer to authenticate, we may add as a further finding of fact that the acceptance of either of these bids with the other items we have found here would establish a constructive total loss and sustain the libel. It is probably for that reason that the respondent failed to offer any evidence to authenticate the honesty and competency of those bids.

■ One of our judges has already decided that the rule of constructive total loss may be law applicable to this case though the vessel insured was out of commission. Jeffcott v. Aetna Ins. Co., supra. On trial respondent raised several other objections to the rule and to its application which we must consider. As we understand the law of insurance against marine perils, it is this: The insured, when the vessel is not actually destroyed as a vessel, is entitled to payment as for a total loss in either of two events: (1) that the vessel is in imminent peril of an actual total loss; (2) that the cost of repairs of the actual damage sustained exceeds fifty percent of the insured value. The law is thus established in Peele v. Merchants' Insurance Co., 19 Fed. Cas. 98, No. 10,905, in which Judge Story discusses the two conditions as different and finds each and both satisfied by the facts of the case. Respondent's counsel offers this case as an authority for his theory that imminent peril and probable loss exceeding fifty percent of the value must both be present and cites the language which appears on page 110 of 19 Fed.Cas.: "If the facts then present a case of extreme hazard, and of probable expenses exceeding half the value of the ship, the party may abandon, although in the event, it turn out that the ship is gotten off at a less expense." That Homer was nodding when this language was written appears conclusively from a reading of the opinion. The plaintiff's insistence of the separate existence and distinct fulfilment of each of the two conditions as we have stated them appears at the foot of page 102 of 19 Fed. Cas. The court's decision, sustaining the right to abandon solely because of the existence of a high probability of an actual total loss at the time of abandonment, and even assuming the actual expense to be less than half her value, appears at page 112 of 19 Fed.Cas. A discussion of the cost of repairs, if it exceeds fifty percent of the value, and without any condition of peril, as another and entirely separate ground for judgment favoring the plaintiff, appears immediately following, on page 113 of 19 Fed.Cas., and the court offers to appoint a master to determine the precise amount of the damages to sustain his award of judgment on that contention, standing by itself, on page 116 of 19 Fed.Cas., in the second column. The belief is expressed in Deblois v. Ocean Ins. Co., 16 Pick. 303, 33 Mass. 303, 28 Am.Dec. 245, that the jurisdiction assumed by the Admiralty Court in this case was not sustained in the Supreme Court but the case has been cited as the law ever since it appeared in the books. The same holding appears in Orient Mutual Insurance Co. v. Adams, 123 U.S. 67, 8 S.Ct. 68, 72, 31 L.Ed. 63, where the policy provided there should be "no abandonment as for a total loss on account of said vessel grounding or being otherwise detained, or in consequence of any loss or damage, unless the injury sustained be equivalent to fifty per centum of the agreed value in this policy," and later provided: "In no case whatever shall the assured have the right to abandon unless it shall be ascertained that the recovery and repairs of said vessel are impracticable, * * *." Since the latter provision said: "In no case whatever" it certainly included the case provided for in the earlier provision. Nevertheless, the Supreme Court did not hesitate to hold that the fact of less damage than fifty percent of the insured value was not decisive of the right to abandon, quoting Bradlie v. Maryland Ins. Co., 12 Pet. 378, 37 U.S. 378, 9 L.Ed. 1123: "If the abandonment when made is good, the rights of the parties are definitely fixed, and do not become changed by subsequent events * * *." This can mean only that the right to abandon when recovery was impracticable was a vested right at the time it was exercised if sufficiently founded. We take it that a finding of impracticability of recovery and repair of the vessel in this case, where she had gone over a falls and hung on a rock in the Ohio River is the same as holding her in imminent peril of a total loss. In

Patapsco Ins. Co. v. Southgate, 5 Pet. 604, 8 L.Ed. 243, the judgment of the lower court which had charged in the disjunctive either the quantity of the loss or the probability of total loss as a sufficient condition for abandonment, was affirmed. On the other hand, in Bradlie v. Maryland Ins. Co., supra, a finding of total loss, because the quantum of damage exceeded fifty percent of the insured value, was affirmed where no claim of abandonment was made upon and no condition was asserted of an imminent peril of total loss. The confusion which is apparent in the cases is traceable to the language used by the author at 3 Kent 321, where he said: "The insured is to act not upon certainties but upon probabilities and if the facts present a case of extreme hazard and probable expense costing half the value of the ship, the insured may abandon if it may happen that she was afterwards recovered at a less expense." This statement has been frequently cited although we can find no adjudication based upon it; indeed, it has even been modified in the course of repetition into statements that probable loss exceeding half the value of the ship warrants abandonment and a claim for a total loss. As a matter of fact, the idea of a vessel in extreme hazard of a loss of half its value is difficult to comprehend. Either the whole vessel is in peril or not and peril means that her existence as a vessel is endangered, so that an entire and complete loss measured by her value appears to her owner's reason as highly probable. Such complete loss includes any partial loss. On the other hand, a constructive total loss occurs when repairs actually and in fact will or did require an expenditure exceeding half of the value of the vessel. Peril adds nothing to this requirement. As is to be expected, any vessel in peril of total loss has already suffered some loss and that fact may be one of the considerations tending to compel a judgment of imminent peril of a total loss. That is quite unlike a necessary condition. We, therefore, believe that the two conditions are distinct and different; that either one excludes the other and we hold that the existence of either is a proper condition for abandonment. Inasmuch as our courts have frequently referred, as did the court in Orient Mutual Ins. Co. v. Adams, supra, to the right to abandon as vested in the event of high probability of total loss, we think it certain that the percentage of loss actually

sustained as developed in the final event must be irrelevant and, therefore, a probable or actual partial loss would have no pertinence to the right of its exercise, excepting only, as we have said, as a possible element in the formulating of a judgment. We have read decisions where the courts used the phrase "probable loss exceeding fifty percent" but in every one of them the damage was a fact at the time the claim was made and the language used obviously refers to the estimated cost of repair which had not yet been liquidated when the vessel was abandoned. "Probable" includes the idea of futurity and lack of exact knowledge and "loss" is used for cost by which it is measured. To concede the insured the right to surrender because he envisions a future loss of half the vessel's worth would make the policy an instrument of larceny and not of indemnity.

We think further, that the Massachusetts law, which respondent asks us to apply, is not different. The policies in suit here were countersigned at Boston, Massachusetts, and their validity is conditioned upon countersignature. They were issued to one Alden, a Massachusetts broker whose sticker appears on the back of each policy. The libellant's premiums had been sent to Mr. Alden for payment. We would be inclined to call them Massachusetts contracts. Restatement on Conflict of Laws, § 319; Western Massachusetts Fire Ins. Co. v. Hilton, 42 App. Div. 52, 58 N.Y.S. 996. When most of the Massachusetts cases cited by respondent conditioned surrender upon a positive showing of excessive damage, they were construing policies which contained a clause making that single condition the understanding of the parties. See argument of counsel, Heebner v. Eagle Ins. Co., 10 Gray 131, 142, 76 Mass. 131, 142, 69 Am. Dec. 308. Sewall v. United States Ins. Co., 11 Pick. 90, 28 Mass. 90; Reynolds v. Ocean Ins. Co., 22 Pick. 191, 39 Mass. 191, 33 Am.Dec. 727. In Hall v. Franklin Ins. Co., 9 Pick. 466, 26 Mass. 466, the court declared it was unwilling to accept the theory pressed upon it by counsel for the plaintiff that imminent peril of a technical total loss warranted abandonment. In the earlier part of his opinion he used "technical" and "constructive" as synonymous. He declined to find facts justifying abandonment as for a total loss. This decision is in precise accord with the Federal law

though it has frequently been garbled and misrepresented. See Deblois v. Ocean Ins. Co., supra. Wood v. Lincoln & Kennebeck Ins. Co., 6 Mass. 479, 4 Am.Dec. 163 and Marmaud v. Melledge, 123 Mass. 173, at 178, both recognize the existence of the law as we have stated it. Severity in determining the facts seemed to mark the Massachusetts cases of that era. In Sewall v. United States Ins. Co., supra, the court refused to find that a ship submerged, originally eight miles from land and two miles when salved, was in extreme hazard of total loss because she was a new and strong vessel visible though submerged. These cases all involved wooden sailing vessels and maybe experience had taught the trade that such vessels could be readily salved and cheaply repaired but in any event the determinations are all questions of fact and there is no adjudication in any of them contradicting the conclusions we have reached. There is contrary dictum in Peele v. Suffolk Ins. Co., 7 Pick. 254, 24 Mass. 254, 19 Am.Dec. 286, where, though the court found as a fact that the vessel was in a state of peril and nevertheless said that subsequent events must determine whether or not the loss was then total, he thereupon proceeded to affirm a judgment against the underwriter because it had accepted abandonment. The Massachusetts cases of this era must all be judged in the light of the animosity entertained by the freemen of that Commonwealth for the Federal Admiralty Courts which were looked upon as lineal successors of the detested Vice Admiralty Courts, whose efforts to enforce the tyrannical navigation laws for the benefit of the Crown which had created and controlled them, had earned the enmity of all the residents of the Atlantic Coast in the preceding century. The States were at that time asserting the jurisdiction of their own courts over admiralty causes and the prejudice against the Federal Admiralty Courts urged them to extremes to avoid the appearance of agreement. But even if the Massachusetts cases were thought to establish a different theory of liability, we would not feel bound by any of them. The Admiralty Court has jurisdiction of an action on a marine insurance policy. New England M. Insurance Co. v. Dunham, 11 Wall. 1, 20 L.Ed. 90. Another judge of this court has decided this to be the law here. When actions in personam on a maritime insurance policy were held to be within admiralty jurisdiction, the decision meant more than that an admiralty court could lend its premises for a hearing. It could not mean less than that the law determining the rights under such policies was that formulated by the admiralty courts, if they had formulated it, and which would necessarily be independent of any desire for variation manifested by a state tribunal. The law we have shown has been formulated by the admiralty court and actually enforced. This law is independent of state law whether it be statutory or set up by judicial decision. Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L. Ed. 1086, L.R.A.1918C, 451, Ann.Cas.1917E, 900; Knickerbocker Ice Co. v. Stewart, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834, 11 A.L.R. 1145; Union Fish Co. v. Erickson, 248 U.S. 308, 39 S.Ct. 112, 63 L.Ed. 261.

And we think the respondent also liable as for a constructive total loss on the ground that when abandonment was tendered, the "Dauntless" was in a then present peril of an actual total loss. The testimony of the vessel's designer evincing exact and thorough knowledge of the vessel together with business experience and professional qualifications commanded respect. At the time abandonment was tendered, he estimated the loss to be $175,-000 or $200,000. This included no damage for a strain which he thought quite probable. It did not include salvage. The salvage alone is so doubtful a quantity that Merrill, Chapman & Scott, the testimony in this case shows, would not enter upon the salvaging of the "Dauntless" excepting only upon a no cure, no pay basis which means a large percentage of the value would be the cost of the contract if the job were successful. As a further fact, the actual job of salvage performed by the respondent's agent was done on a cost plus basis together with a bonus and turned out to be a pretty shoddy job even on those terms, the vessel being grounded over night and probably, though we have declined to find it as a fact, having suffered additional damage during the process. It is true that the water in the vessel on the day of the abandonment remained at a height fixed some days before but, nevertheless, a holing, we think, was a possibility that deserved consideration. Considering the depth to which the hull descended into the river bottom we regard it as a real possibility that any hole would have been

plugged sufficiently to avoid perceptible tidal additions to the vessel's water content during those days. And we think from her position a strain was so apparently probable that its assumption as a fact is entirely reasonable. No one knew the nature of the river's bottom, it was not sounded until mid December. One could but guess how long the rotted hulks would sustain the bow or the damage that would follow their collapse nor, if they stood up, what they would do to the hull when the "Dauntless" was being removed. We think the obvious damage at the time of surrender is included in the specifications and see no reason why, in determining the probability of total loss at the time of surrender, the bid of George Lawley & Sons, for a sum in excess of $150,000, does not evidence the reasonableness of such a conclusion. If we add the winter house and mast and probable damage not then open to investigation, we think that any reasonable uninsured owner at the time of abandonment would have declined to spend a cent on the "Dauntless" unless he were willing to spend more than the insured value of the vessel. We, therefore, find a constructive total loss on the theory of high probability of total loss as we have earlier set it forth.

One of the policies involved here is a disbursement policy in the sum of $80,000. It contracted "a total and/or constructive total loss paid by underwriters on hull" to be a total loss under this policy. Such policies have long been sustained. International Navigation Co. v. Atlantic Mutual Ins. Co., D.C., 100 F. 304. It may be that in some instances these policies more nearly approach the character of gambling contracts than other insurance policies. We think that the vessel insured here is a peculiarly fit subject to be insured under a disbursement policy and under its literal construction liability for the full amount of the policy falls upon the respondent.

The policy provides that loss or damage that resulted from want of due diligence by the owner of the vessel or by the manager shall not be covered. Any contention that a leaky deck caused any damage is a mere assertion, nothing in the case tends to prove it. We have already found the vessel seaworthy both in the condition of her hull and in respect to the caretaker, and that her water damage was occasioned by the passage of the water through the sluice gates and the doors in her bulkhead. An important fact in addition is that the severe damage to the vessel was done by water above the cabin deck through the hatch in the ceiling of the trunk room immediately forward of the lazaret. We have already found that Schmidt must have known about the sluice gate in that bulkhead and certainly the evidence is clear that the owner put him in a position where a man of ordinary intelligence must have known of its existence. The damage above the floor of the cabin once done, was complete. Respondent hints that because the signal telegraph wires ran through the trunk room bulkhead the libellant is in a bad case inasmuch as the insurance was issued on the theory that there were four tight bulkheads, a fact reported by Lloyd's Register. There is no evidence in the case that the insurance company consulted Lloyd's Register as to whether or not there were bulkheads or relied on it if it did consult it and we do not give this contention any further consideration. The efficient proximate cause of the damage was the hurricane and nothing else and we find no lack of diligence at all in the owner of this vessel that could be held even remotely to have contributed to the damage. There is no persuasive evidence in the case that the failure to pump, subsequent to the pumping which libellant had done, caused any damage. Moreover, it was demonstrated on the trial that the failure to pump was a wise precaution, for the water made the hull stable and saved further hull damage.

We, therefore, allow judgment for the face amount of both policies with interest from the date of filing of claim. The decree will provide for the appointment of a Master who will compute the amount due in addition under the sue and labor clause of the policy.

Exhibit JJJ is stricken from the record. Russell v. Hudson River R. Co., 17 N.Y. 134, at 140.