**KINGFISHER, INC., Plaintiff,**

v.

**BOSTON OLD COLONY INSURANCE COMPANY, Defendant.**

**Civ. A. No. 75–3359–F.**

United States District Court,
D. Massachusetts.

Feb. 22, 1980.

Morris D. Katz, Boston, Mass., for plaintiff.

Bertram E. Snyder, Boston, Mass., for defendant.

## OPINION

WALTER E. HOFFMAN, Senior District Judge.

The F/V KINGFISHER, owned by plaintiff, Kingfisher, Inc., suffered extensive fire damage on May 23, 1975, while moored at the Gloucester Marine Railway in Gloucester, Massachusetts. The vessel was insured by defendant, Boston Old Colony Insurance Company, under a hull policy which specifically limited recovery to the total loss or constructive total loss of the vessel. Constructive total loss was defined in the policy as follows:

> No recovery for a Constructive Total Loss shall be had hereunder unless the expense of recovering and repairing the vessel shall exceed the insured value.

The insured value of the policy was $90,000.

Having been advised of the fire aboard the KINGFISHER, defendant's Boston area claims manager, James J. Godwin, contacted Edward Hawkes, a marine surveyor, who agreed to survey the damage to the vessel. Hawkes was also instructed by the defendant to furnish a copy of his survey to Gloucester Marine Railways Corporation in order to receive a repair estimate. Gloucester Marine submitted an estimate of $97,209.96. This figure was much greater than Hawkes' own rough estimate of $71,118 and, there-

fore, Hawkes, after consultation with Godwin, arranged for Fairhaven Marine, Inc., to make a bid for the repair of the vessel. Fairhaven's bid was $57,500, excluding electronics and hydraulics [1] which, when added to the Fairhaven estimate as given, ran the total to $79,440.

On August 4, 1975, plaintiff formally abandoned the KINGFISHER to defendant and demanded payment of $90,000, claiming that the vessel was a constructive total loss under the terms of the policy. Defendant denied this claim on the basis of the estimates submitted by Hawkes and Fairhaven Marine.[2]

▮ The sole issue in this case is whether the cost of repairing the vessel exceeded $90,000 so as to constitute a constructive total loss under the policy.[3] Although the plaintiff bears the burden of establishing costs in excess of $90,000, *Calmar S. S. Corp. v. Scott*, 209 F.2d 852, 853 (2d Cir. 1954); *Indemnity Marine Assurance Co. v. Cadiente*, 188 F.2d 741, 743 (9th Cir. 1951); *Compania Maritima Astra, S.A. v. Archdale*

*(The ARMAR)*, 134 N.Y.S.2d 20 (S.Ct.1954), 1954 A.M.C. 1674, 1676, "the trier of fact must scrutinize with care anticipated expenses, making an independent determination of what the expenses really would have been." *Lenfest v. Coldwell*, 525 F.2d 717, 725 (2d Cir. 1975).

▮ As there was no evidence at trial with respect to the actual cost of repairing the vessel,[4] the court must rely primarily on the estimates offered by the parties as the basis for its determination of the cost of repairs. *Jeffcott v. Aetna Ins. Co.*, 40 F.Supp. 404, 408 (S.D.N.Y.1941), *aff'd in part*, 129 F.2d 582 (2d Cir. 1942). Consideration is limited, however, to the bids submitted by Gloucester Marine and Fairhaven Marine.[5]

Plaintiff relies on the estimate submitted by Gloucester Marine to prove its claim of a constructive total loss. Plaintiff asserts that this bid of approximately $97,000 was a reasonable, bona fide estimate of the cost to repair the vessel based on several years experience in ship building and ship repair.

1. To complete the Fairhaven estimate, defendant added to this figure the electronics estimate obtained by Hawkes from Crawford Marine ($17,440) and the hydraulics estimate from Gloucester Marine's bid ($4,500). The final figure is $79,440.

2. In addition to the estimates mentioned above, defendant introduced at trial an estimate of $73,940 prepared by Capt. Cornelius Houtsma, U.S.C.G. (Ret.). Captain Houtsma is an expert in repair specifications and bids and was retained by defendant after it had denied plaintiff's claim.

3. There is no dispute that the vessel was not a total loss. A total loss exists when the vessel no longer exists *in specie* or is absolutely and irretrievably sunk. *Lenfest v. Coldwell*, 525 F.2d 717, 723 (2d Cir. 1975).

4. A witness was to have testified as to the ultimate repairs but did not appear in time for the presentation of plaintiff's case in chief. No request was made to put the testimony on by way of further direct testimony and the matter was not mentioned until after the record was closed. Likewise, the marine surveyor, Hawkes, did not testify as counsel had erroneously assumed that the case would take two days to try but it was easily completed in one day.

5. The Houtsma estimate (see fn. 2) was formulated approximately five months after defendant denied plaintiff's claim and seven months after the fire. Clearly, this estimate was not obtained in order to evaluate plaintiff's claim. In addition, Captain Houtsma testified that he did not prepare this estimate with the intent of repairing the vessel. In *Streckfus Steamboat Line v. United States*, 27 F.2d 251, 252 (5th Cir. 1928), the Fifth Circuit found that certain bids offered by plaintiff to prove necessary repairs to its vessel were solicited "merely for the purpose of using them in evidence, and with no intention of letting the work." The court held that such bids have very little, if any, probative value. *See also, The ARMAR*, 1954 A.M.C. at 1677. The Houtsma bid was obtained for trial purposes only and therefore it was essentially excluded from consideration.

The surveyor, Hawkes, also submitted an estimate of repair costs. Although Hawkes did not testify at trial, his deposition was received in evidence without objection. A review of the deposition discloses very little proof as to this estimate, other than the fact that it was made. The proof is not sufficient to sustain or authenticate the estimate or the method Hawkes used in assessing the damage his survey revealed. For this reason, his estimate must be rejected as well. *Jeffcott v. Aetna Ins. Co.*, 40 F.Supp. at 408.

In rebuttal, defendant contends that even though it requested Gloucester Marine to prepare the estimate, the Gloucester bid was not a bona fide effort to obtain a repair job but rather was an attempt to provide Kingfisher, Inc., with proof of damages in excess of $90,000. Defendant asserts that the estimate is unreasonable in several respects and sets up the Fairhaven Marine bid as a more substantiated and more reliable estimate of the repair costs. In addition, defendant attacks the credibility of Anthony Parisi, the president of Gloucester Marine, suggesting that Parisi may have colluded with Carlos Singara (now deceased), the captain of the vessel, to present a bid that exceeded $90,000. The court will first examine the alleged unreasonableness of the Gloucester bid and then consider the issue of Parisi's credibility.

## I. UNREASONABLENESS OF GLOUCESTER MARINE'S ESTIMATE

■ It is difficult to make an item by item comparison of bids submitted by different shipyards because of the different methods used to compute repair costs. However, in the instant case, it is clear that the key areas of dispute are the estimates for materials and electronics.[6] Each of these will be examined separately.

### (a) Electronics

The total electronics estimate in the Gloucester Marine bid is $21,576. This includes an estimate of $19,776 by Graham Marine Electronics for the bulk of the equipment, and an $1800 estimate by Crawford Marine Electronics for an automatic compass. Defendant contends that the Graham Marine estimate includes equipment of a type not aboard the vessel at the time of the fire and asserts that the $19,440 estimate obtained from Crawford Marine by the surveyor, Hawkes, is a more accurate summary of the damaged electronic equipment.

A comparison of the two estimates reveals that Graham Marine included equip-

ment which cannot be reasonably allowed. The damaged radars aboard the vessel were a Decca 050 and a Plessy MR12. Graham proposed to replace these with two Radiomarine N–11A radars at a cost of $9200. The Crawford estimate listed the original radars at a total of cost of $6195. The court will reduce the Graham estimate by the difference, $3005. In addition, the court must disallow the Graham estimate of $1751 for a Konel Fishscope. The original equipment on board was a Faruno Fishscope which Crawford Marine listed for $1000. This $751 difference must be deducted from the Graham estimate as well. Other than as noted above, the court finds that the Graham Marine bid is a reasonable estimate of the cost to replace the damaged electronic equipment. The net reduction for electronics is $3756.

### (b) Materials

In preparing the Gloucester Marine estimate, both Anthony Parisi and Harry Cusick surveyed the damage aboard the KINGFISHER. Parisi was the president and Cusick, the general manager of the Gloucester shipyard. On the formal bid drawn up by Parisi, material costs were estimated at $18,000. This figure was apparently in accord with the rough calculations of Cusick. However, at trial, Cusick testified that, in addition to basic material costs, his $18,000 figure included estimates for hydraulics and plumbing, items that were individually estimated on the formal bid.

The court agrees with defendant that the Gloucester Marine bid overstates reasonable material costs. It may well be that Parisi mistakenly used Cusick's rough figure of $18,000 without realizing that this estimate also included hydraulics and plumbing. In any event, the Court will reduce the Gloucester Marine materials estimate by $6100. This amount represents the estimates of $4500 for hydraulics and $1600 for plumb-

---

**6.** At the outset of the trial, defendant urged an error in the labor estimate. However, as the record discloses, this contention essentially evaporated after an error in excess of $2000 was discovered in defendant's computation.

ing which were included in the formal bid.[7] However, the revised figure of $11,900 only covers those materials necessary to repair the vessel according to the surveyor's specifications. To these costs the court must add "a sum representing items not already included which may properly be included within the meaning of 'recovering and repairing' as appears in the policy." *The AR-MAR*, 1954 A.M.C. at 1683. Parisi testified that he noted several items not included in the Hawkes survey which were necessary to restore the vessel to its prior condition.[8] These items are (1) Fuel oil—water used in putting out the fire aboard the KINGFISHER flooded the fuel tanks which were subsequently pumped out. Estimated replacement cost—$1400; (2) lubricating oils—oil for hydraulic system, engines, reduction gears and lube tank had to be replaced. Estimated cost—$300; (3) Grease, bulbs and tape—for equipment in forecastle. Estimated cost—$500; and (4) testing air compressor and refitting of refrigeration motor. Estimated cost—$1,000. The court finds that these are reasonable and necessary

costs. Given the $6100 reduction noted above and the addition of these costs ($3200), the net reduction in material costs is $2900.

## II. CREDIBILITY OF PARISI.

In order to discredit the Gloucester Marine bid, defendant sought to impeach the testimony of Anthony Parisi, the president of the shipyard. Defendant asserts that Parisi's purpose in submitting the bid was to provide plaintiff with proof of loss in excess of $90,000 rather than to obtain a repair job.[9] Defendant cites several inconsistent statements made by Parisi and notes the friendship between Parisi and the KINGFISHER's captain, Carlos Sinagra. Defendant further points out that Harry Cusick, not Parisi, usually signed estimates prepared by the shipyard.

After reviewing the evidence in this case, the court is not convinced that it should reject the Gloucester bid on this basis. The shipyard has an excellent reputation and has always been considered competitive in

7. Cusick also testified that he estimated basic material costs at one-third the cost of labor. This one-third material to labor ratio is a common method of estimating costs in the ship repair industry. However, as defendant's expert witness, Capt. Houtsma, testified, this ratio is not absolute—it is dependent on the type of job involved. With the reduction of $6100, the materials estimate is 37 percent of labor.

8. These items were not included in the Gloucester estimate because of a company policy to bid only on that damage specified in the surveyor's report. Nor were they included in Fairhaven's estimate.

Parisi also noted an estimate of $1000 to $3000 for hidden damage behind the port fuel tanks in the engine room. This item raises the question of how the court should interpret the following language which is contained in the bids of both Gloucester and Fairhaven: "It is the intent of these specifications to repair and restore the vessel to the same condition as it was immediately prior to the fire. Any work not specifically mentioned but necessary to do shall be considered as included herein." Read literally, this clause would require shipyards to repair damage that neither they nor the surveyor noted. In the instant case such an interpretation would require Gloucester to replace the fuel oil and other items mentioned in the body of this opinion even though it was not asked to bid on that damage. Similarly, Fairhaven

would be required to replace hydraulics and electronics, both of which are items it did not bid on but are necessary to restore the vessel to its prior condition. Emile Kszytyniak, who prepared the Fairhaven estimate, testified that he submitted his bid with the reservation that he was not bidding on electronics and hydraulics, but that reservation is not spelled out in the bid.

The court adopts what it considers to be a reasonable interpretation of the clause. If the surveyor surveys a particular area and notes the damage in that area, all work necessary to repair the damage shall be included in a bid even if that work is not specifically mentioned. In the instant case, Hawkes surveyed the damage in the engine room, in particular, behind the port fuel tanks, and did not note any damage other than as outlined in his report. The court will therefore not allow the $1,000 to $3,000 "hidden" damage as a reasonable cost of repair.

9. It is entirely speculative as to whether Parisi had knowledge of the necessity to show damages in excess of $90,000 in order for plaintiff to recover under the policy. Fairhaven's estimator knew that a policy for $90,000 existed, but denies knowledge of the nature of the policy. Certain others involved knew the provisions of the policy.

**32**

its bidding. Other than by his inconsistent statements, Parisi has in no way been discredited. These inconsistencies must be attributed to the nearly four years delay between Parisi's deposition and the trial.

In conclusion, the court finds that the Gloucester Marine bid is fair and reasonable under all of the circumstances in this case, subject, however, to the comments made herein. As noted above, the materials estimate must be reduced by $2900 and the electronics estimate by $3756, for a total reduction of $6656. Subtracting this amount from the original Gloucester bid of $97,209.96, the corrected estimate is $90,553.96.[10] The court therefore holds that plaintiff has sustained its burden of proving repair costs in excess of $90,000, and finds that the vessel was a constructive total loss under the terms of the policy.

■■■ This action is under Rule 9(h)[11] and is subject to the admiralty rule with respect to the allowance of interest. It is not governed by the Massachusetts statute as to interest applicable to diversity cases. The vessel was abandoned on August 4, 1975. In the opinion of the court, interest should run at the statutory rate as provided by the law of Massachusetts from November 4, 1975 until paid.

A judgment order in accordance with this opinion shall be prepared by counsel for plaintiff, submitted to counsel for defendant for endorsement (the endorsement of counsel for defendant is not to be considered as an agreement to the findings and conclusions herein, but only to the form and computation of interest), and thereafter forwarded to the court for approval. The court will forward the judgment order to the Clerk for entry.

10. In order to compensate for any inaccuracies in estimates received for the purpose of determining whether a vessel is a constructive total loss, courts generally add a "contingency allowance" to the calculated amounts. *Lenfest v. Coldwell*, 525 F.2d at 725 n. 17. Although there is not a settled percentage, the few courts that have considered this problem have added ten percent. *Compania Maritima Astra, S.A. v. Archdale (The ARMAR)*, 1954 A.M.C. at 1682; *see Helmville Ltd. v. Yorkshire Ins. Co., Ltd.*

*(The MEDINA PRINCESS)* 1 Lloyd's List L.R. 361, 408 (Q.B.Div.1965); *Irvin v. Hine*, 83 Lloyd's List L.R. 162, 172–73 (K.B.Div.1949).

It is not necessary to add such an amount in the instant case because the court has found that the cost of repairs exceed the $90,000 threshold figure.

11. Defendant admitted in its answer that the action was in admiralty. We need not, therefore, consider the jurisdictional question.