**CALMAR S. S. CORP.**
v.
**SCOTT et al.**
No. 194, Docket 22254.

United States Court of Appeals,
Second Circuit.

Argued on Remand from the Supreme
Court of the United States
Dec. 8, 1953.
Decided Jan. 25, 1954.

Walter B. Hall, Mendes & Mount, New York City (Russell T. Mount, New York City, on the brief), for appellants.

Edwin S. Murphy, Kirlin, Campbell & Keating, New York City (Ira A. Campbell and Helen C. Cunningham, New York City, on the brief), for appellee.

Before CHASE, Chief Judge, and L. HAND and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

The appeal of the underwriters from a decree in favor of the libellant comes back to us on remand of the Supreme Court, 345 U.S. 427, 73 S.Ct. 739, 97 L. Ed. 1125, after it had vacated our decree, 2 Cir., 197 F.2d 795, that had reversed a decree of Judge Ryan, D.C., 103 F.Supp. 243. The suit was upon a policy of marine insurance upon the steamer, Portmar, which was injured by the fire of Japanese airplanes, while in the harbor of Port Darwin, Australia, on February 19, 1942. The underwriters defended on the ground that the policy had ceased to be in force, and that in any event the Portmar did not become a "constructive total loss," so that they were liable at most for only a partial loss. We decided that they were right on the first point, and therefore we had no occasion to consider the amount of the award. The Supreme Court held that the policy was still in force, and that Judge Ryan had been right in holding the underwriters liable; but, since we had not passed upon the proper amount of the award, it remanded the appeal to us for final disposition. The only issue is therefore whether the award should be for a "constructive total loss," or for a partial loss. We need not describe in detail the general situation, which Judge Ryan very fully set forth in 124 Findings of Fact. Of these Nos. 84 to 90 inclusive; Nos. 95, 96 and 97; and Nos. 101 to 113 inclusive, describe the injuries suffered by the Portmar, the circumstances of her raising and temporary repairs, the conditions at Port Darwin at the time, her towage to Brisbane, and the "preliminary survey" for repair at that port. To these we refer and accept them. The underwriters' defence is three clauses in the policy—the first reading as follows: "No recovery for a Constructive Total Loss shall be had hereunder unless the expense of recovering and repairing the vessel shall exceed the insured value." The two other clauses were these. (1) "The provisions of the attached policy with respect to a constructive total loss shall apply only to claims arising from physical damage to the insured vessel." (2) "Warranted free of any claim for delay." We shall speak of the first clause as the "marine clause"; of the second as the "war risk clause"; of the third as the "delay clause." The underwriters argue that the "marine clause" applied to the occasion at bar; and that the district court was wrong in allowing a "constructive total loss," because the libellant, on whom the proof rested, had not proved that on April 8, 1942, the date of its abandonment of the Portmar, the expense of her recovery and repair would have exceeded $860,000, her "insured value." Hence, they conclude, the only permissible award was the expense of recovery and repair, which was much less. We shall dispose of this argument before considering the "war risk clause."

Insurance being a contract of indemnity, an insurer's promise goes no further than to make good the insured's

loss; hence it would follow that, when a ship is wrecked, but not lost or broken up into such fragments that it ceases to be a ship at all, an insurer is liable only for the expense of restoring her to her former condition. On the other hand, if she is on a strand and has become innavigable as she lies, it is often true that for practical purposes this expense is not full indemnity, for the insured has neither the immediate benefit of the ship, nor of the expense, whose payment after long delay may be very far from making him whole. To meet what would otherwise be a failure of the policy to accomplish its purpose, the doctrine of "constructive total loss" was devised, which gives the insured the privilege of compelling the insurer to pay the full amount at once in exchange for the transfer of the wreck. Since this is in effect a transfer forced upon the insurer, it was necessary to hedge it against abuse by the insured; and it is for this reason that the condition was imposed that there must be some relation between the extent of the injury and the value of the ship, when restored. The English and American law differ as to what the relation shall be, but the "marine clause" followed neither, for it required the expense of restoring the Portmar to exceed, not her "sound value," $688,000, but the "insured value," $860,000. Regardless of the evidence as to the probable expense of restoring the Portmar to her condition before she was injured, the first question is whether the "marine clause" is the only possible reliance of the libellant in claiming a "constructive total loss." This in turn breaks down into two questions: (1) whether the law recognizes such a loss in such situations as this record presents, although the expense of recovery and repair is not shown to exceed the value of the ship (in this case the insured value); and (2) whether even if it does, the inclusion of the "marine clause" in the policy should be taken to deprive the insured of that remedy. We think that the record presents a situation in which the law does recognize such a loss, and that the "marine clause" did not toll it.

■ Our reason for thinking, as we do, that the situation at bar justified the libellant's abandonment of the Portmar, even though the prospective expenses of recovery and repair did not exceed the insured value, is that that follows from the basis of the privilege itself. As we have said, it is granted to relieve the owner of the embarrassment of having upon his hands a ship, completely useless as she lies, and being without remedy until such time as she can be recovered and repaired, which may mean an indefinite postponement. For this reason he must invoke the privilege in season:[1] and, as a corollary, his right to do so depends, not upon what the expense turns out in the end to be, but upon what it probably will be, "so far as any reasonable calculation can be made, in the highest degree of probability."[2] Indeed were the second not true, it is impossible to see how the privilege could be of any practical value whatever, for the owner would always invoke it at his peril, precisely the risk from which it was devised to relieve him. It follows inescapably, so far as we can see, that if the ship has become innavigable because of a risk insured against, and, if it is impossible for the owner, within the time allotted to him to elect whether to abandon, to form any reliable estimate of the prospective expense of her recovery and repair, to say nothing of an estimate "of the highest degree of probability," he is entitled to abandon; and this we think is a privilege given by the law quite aside from any provision in the policy, although of course the policy may provide otherwise.

It is true that the situation does not appear to have arisen often in the courts; but the British Marine Insurance Act, § 60(2) goes so far as to provide that it shall be deemed a total loss,

1. Independent Transportation Co. v. Canton Insurance Office, D.C., 173 F. 564.

2. Bradlie v. Maryland Insurance Co., 12 Pet. 378, 398, 9 L.Ed. 1123.

"where \* \* \* it is unlikely that" the owner "can recover the ship." Moreover, Story, J., in the often cited case of Peele v. Merchants Insurance Co.,[3] based his decision upon two separate grounds, the first of which he stated in the following terms: "the right to abandon exists, whenever from the circumstances of the case, the ship, for all the useful purposes of a ship for the voyage, is, for the present, gone from the control of the owner, and the time when she will be restored to him in a state to resume the voyage is uncertain, or unreasonably distant, or the risk and expense are disproportionate to the expected benefit and objects of the voyage. In such a case, the law deems the ship, though having a physical existence, as ceasing to exist for purposes of utility, and therefore subjects her to be treated as lost." This language, though it seems to have been pervaded by the notion, then, but no longer, current, that the loss of the voyage was a factor in the result, is, *mutatis mutandis,* applicable today. Judge Clancy read the opinion in this sense in Jeffcott v. Aetna Ins. Co., D.C., 40 F.Supp. 404, 410, although we did not have occasion to consider the point when we affirmed his decree; 2 Cir., 129 F.2d 582. We conclude therefore that had the "marine clause" been absent, the libellant could have abandoned the Portmar, being innavigable as she was, if it was impossible to calculate the expense of her recovery and repair within the time allowed for abandonment.

The situation on April 8, 1942, was just such an occasion; at that time it was impossible for the libellant to make any guess as to what would be the expense of recovering and repairing her that would not have been as remote from reality as an astrologer's horoscope. The argument of the underwriters is based altogether upon the expense of the military authorities in salvaging her and patching her up enough to serve until she was finally lost in one of the ventures on which they sent her. That expense was utterly irrelevant to the issue, unless the services for which it was the price were accessible to the libellant, and they were not. Only the authorities themselves could get an hour's work done on that ship or any other ship. In their desperation they seized upon everything that would float, or that could be made to float and upon any means that would make it float. All drydocks and repair shops were as much beyond the libellant's command, while the emergency lasted, as the Portmar was removed from the places where the docks and shops were themselves situated; and it was, humanly speaking, certain that the situation would remain unchanged until long after the time had expired within which the libellant must exercise its privilege. The underwriters answer that when a third party has intervened on such occasion as salvor the courts have looked to the expense of his services as a measure of recovery and repair.[4] That would indeed have been material, if the authorities had raised the Portmar, towed her to Brisbane and patched her for service, all in the interest of the libellant, though it would have been necessary, even so, to add the expense of doing complete repairs upon her. But nothing was further from the minds of those who restored the Portmar than the interests of the libellant. They meant to use her for their own purposes; they repaired her only so far as was important to these; they used her upon ventures of their own wholly removed from the libellant's; and after seven months they condemned her and sent her upon a mission on which she was destroyed. We do not suggest that these were events which the policy covered; they were not; but they are a complete answer to the argument that they were evidence of any means, accessible to the libellant and relevant to the expense of recovery and

3. Fed.Cas.No.10,905, 19 Fed.Cas. pages 98, 111.

4. Indemnity Marine Assurance Co. v. Cadiente, 9 Cir., 188 F.2d 741; Fireman's Fund Ins. Co. v. Globe Navigation Co., 9 Cir., 236 F. 618; The Blairmore, L.R. [1898] A.C. 593.

repair under the "marine clause." For these reasons we hold that the libellant proved that the Portmar was a "constructive total loss" without regard to what would have been the expense of her recovery and repair.

■■ The argument proceeds, however, that we are to read the clause as meant to cover all cases of "constructive total loss" upon the maxim, *expressio unius, exclusio alterius.* At least, if that is not the argument, it is hard to see what else it can be, because the clause does not expressly say that it shall cover all instances of such a loss. The inference is by no means inevitable; indeed, it seems to us an illegitimate one. In the first place, it would deprive the libellant of the privilege of abandonment upon an occasion when, not only did the circumstances make it quite as important to him as though the clause applied, but when the insurer had no greater conflicting interest than when it does. Again, those circumstances were so exceptional that the parties would certainly not have anticipated them. Moreover, its introduction into the policy was important for quite other reasons than to make it the exclusive provision for a "constructive total loss." Although the policy was executed in London, and was therefore presumably to be construed under English law, the privilege of abandonment was part of the remedies, and the law of the place of performance of a contract ordinarily determines them.[5] True, the place of performance was also probably London; but it is not entirely clear where it would be; for the libellant is a Delaware corporation; the Portmar was registered in the U. S. and was under charter to the Maritime Commission. Thus, it was in any event desirable to avoid dispute about the application of the English rule that the repairs must equal the whole, and not half, the value of the ship; and the clause was essen-

tial, because under both laws it is the "sound value" of the ship that measures the extent of the repairs, not the "insured value." Finally, not only was the instrument prepared by the promisor, so that the canon, *contra proferentem,* applies to it, but the promisor was an insurance company.[6] All these reasons in conjunction satisfy us that from the interpolation of the clause we should not infer that the insured was to be deprived of a remedy that it would otherwise have had.

■ In the view we have taken of the "marine clause" we need not consider at length the "war risk clause," for it is only a limitation upon the scope or ambit of that clause: that is to say, it means no more than that the "marine clause" is to be limited to occasions on which the claim rests upon "physical damage." This being its only office, it is irrelevant once we hold, as we do, that, not only does the libellant need no resort to the "marine clause" for affirmative support for its claim for a "constructive total loss"; but that that clause does not forbid recourse to other support than itself for the claim. The same reasoning does not, however, apply to the "delay clause," for that is not a limitation of the "marine clause," but excludes any claim based upon delay. The argument as to this clause can be put most persuasively as follows. Although she was made innavigable on February 19, 1942, the "Portmar" could have lain for a year or more without further substantial damage, after which she could have been raised and repaired. Had it not been for this delay, the libellant would not have been entitled to abandon the ship; so that, even though it be true that it was entitled to abandon the ship, if it were damaged by "military and naval aircraft," the damage had to be severe enough of itself to make her a total loss, and in this case it was not, for she be-

---

5. Restatement of Conflicts § 413.

6. Stipcich v. Metropolitan Life Ins. Co., 277 U.S. 311, 322, 48 S.Ct. 512, 72 L.Ed. 895; Aschenbrenner v. United States Fidelity & Guaranty Co., 292 U.S. 80, 86, 54 S.Ct. 590, 78 L.Ed. 1137; Henjes v. Aetna Ins. Co., 2 Cir., 132 F.2d 715, 719.

came such a loss only when "delay" contributed to damage. This reasoning presupposes that, when a policy covers one risk: *i. e.* a loss occasioned by one kind of event, it does not cover such a loss, if an uncovered event has been necessary to its occurrence, even though the covered event is itself also necessary. In short, the policy does not cover the risk, unless the only cause of the loss is an event included within that risk. To this we do not agree; an insurance against loss from one kind of event is an insurance against any loss to whose occurrence that kind of event is a necessary condition. The insured is indemnified for any loss "caused" by that kind of event, even though it is also "caused" by other events as well. Were this not true, the policy would indemnify the insured only on those occasions, on which the loss would have occurred without regard to any other contributing factors. Strictly speaking, that could never be true, losses always depend upon some nexus of contributing conditions, of which the event insured against—the "risk"—need be only one.

Finally, the underwriters argue that the libellant, having given as its reason for abandoning the ship her "destruction" at Port Darwin, may not now substitute another ground. We should not wish by implication to assent to the notion that, in the absence of some genuine estoppel, such as existed for instance in Rode & Brand v. Kamm Games, 2 Cir., 181 F.2d 584, the insured will forfeit his privilege by failing to put his best foot forward in the beginning; and none of the authorities cited to that effect are authoritative upon us. We read the language in Ohio & Mississippi R. Co. v. McCarthy, 96 U.S. 258, 267, 268, 24 L.Ed. 693 in the light of what the Supreme Court had said just before in the same term in Insurance Co. v. Wolff, 95 U.S. 326, 24 L.Ed. 387. Moreover, we need not answer the question anyway, for the libellant gave no reason to the underwriters for abandoning the Portmar. Its agent, The Stephens Company, wrote to them as follows: "We have been in-

structed by the assured to tender abandonment to you of their interest in the above vessel." It is true that, when the Mather Company wired to The Stephens Company on April 7th, to give the underwriters notice of abandonment, they said that it was "account destruction Portmar Port Darwin"; but The Stephens Company was not an agent of the underwriters, and no one has ever suggested that anything counts but the grounds that the insured gives to the insurer.

Decree affirmed.