**CONTINENTAL INSURANCE COM-PANY, Libelant,**

v.

**The CLAYTON HARDTOP SKIFF bearing Reg. No. NJ 2281 B (formerly known as The Skipton), her motors, tackle, apparel, etc., and Anthony Piperata, Respondent.**

**Civ. No. 109–64.**

United States District Court

D. New Jersey.

March 24, 1965.

Maurice B. McLaughlin, Jersey City, N. J., for libelant.

Henry W. Eckel, Jr., Washington, N. J. (Harold J. Curry, Phillipsburg, N. J., of counsel), for respondent.

LANE, District Judge.

The above matter comes to this court by way of the original and exclusive admiralty jurisdiction provided under 28 U.S.C. § 1333.

The relevant facts are clear on the record and, for the most part, uncontroverted. On or about March 6, 1962, the Clayton Hardtop Skiff known as *Skipton,* owned by respondent Piperata, was lost from her winter storage at Beach Haven during a severe coastal storm. On March 20, Piperata executed a proof of loss to libelant Continental Insurance Company, requesting total reimbursement in the amount of $10,000 as per the terms of his yacht policy.

Respondent was subsequently contacted by one Douglas McNitt, a marine surveyor and adjuster for Continental. Via a letter of April 2, 1962, McNitt among other things informed Piperata that he would have to abandon the then lost skiff to the Corps of Army Engineers. This procedure met with compliance when respondent did so notify the Army Engineers in a letter the following day.

On April 9, Continental's Marine Office of America requested its local representative, The Thomson Agency, to advise Piperata "that we reject and disclaim any ownership or interest in the vessel either in part or in whole." Concerning this practice, Dudley Blond, Hull Claims Manager of the Marine Office of America, testified that the purpose of abandonment was to minimize the liability of both owner and insurer. This measure is taken as a matter of routine, according to Blond, when the insurer is satisfied "there is a constructive loss or total loss of the vessel." On April 25, The Thomson Agency forwarded a $10,000 check to respondent from the Marine Office of America. At that time, acting pursuant to the April 9 letter and a second letter of April 24, Thomson, in Continental's behalf, apprised Piperata of the insurer's intent to reject and disclaim all ownership interest.

During or about the third or fourth week of May 1962, respondent received information that a boat answering the description of the lost vessel had been discovered in a mainland tributary creek about 25 miles from the point of storage. Shortly thereafter Raymond E. Hosbach, an employee of respondent, identified the craft as the *Skipton.*

Respecting the situation and condition of the boat as found, Piperata testified that the inside hull, including the motors, was covered with sand and rested in approximately five feet of water. He averred also that the top was completely off, the back pushed in, several bottom ribs broken, and the craft stripped of all accessory equipment and furnishings. Hosbach described the wreckage as "a hull sitting in mud." He testified that he characterized the boat remains as "junk" in a telephone conversation with respondent. Louis Nasife, a fleet sales representative for Sun Oil who had originally discovered the hull, corroborated the testimony of Piperata and Hosbach in substantial detail concerning the *Skipton's* condition.

Grant W. Bauer, a professional yacht broker, designer, and marine surveyor for some 13 years, was of the opinion that a hypothetical craft lost under the cir-

cumstances of the *Skipton*, and found almost two months following disappearance in the partially submerged state described by the above witnesses, would be "virtually worthless."

Because of respondent's mechanical background and the availability of his similarly-skilled employees, and for, in his words, "sentimental value," an effort was launched to salvage the *Skipton*. Respondent, on May 30, 1962, wrote the Corps of Army Engineers, informing them of this intention. He did not then notify Continental of this endeavor, however, nor did he ever apprise the insurer of discovery and salvage.

After patching the punctured hull, and pumping out the encased sand and water, Piperata and his men attempted to tow the *Skipton* to Toms River for repair. Despite the operation of a gas line pump and two auxiliary bilge pumps, the vessel began to take in considerable amounts of water after some 25 or 30 miles of towing. Since at this juncture only one of two engines was running, and it in a sporadic manner, and the rudders were severely bent, Piperata drydocked the skiff at Waretown, from which place it was hauled to Toms River by employees of the Silver Bay Marina, Inc., the salvaging boatyard.

The record shows that between May 31, 1962, and July 6, 1963, approximately $2,650 was spent in repairing the *Skipton*. Most of this work came during the period May 31 to July 8, 1962, as indicated by the bills in evidence. Regarding the overall time and effort required for salvage, Piperata testified that he and Nasife worked four, and one-and-a-half days, respectively, in order to float and tow the vessel to Waretown. Hosbach estimated that his part in the salvage operation amounted to about four or five days. Piperata stated also that he worked for some two weeks tearing down and overhauling the motors at Toms River. In addition, he noted that another ten or twelve days were consumed by his personal search for the lost skiff.

The general condition of the *Skipton* when first returned to the water in October 1962 was "fair," according to respondent. He testified that much of the major work at the Silver Bay Marina was of a repair rather than a replacement nature. According to Piperata, he wanted the job done as cheaply as possible, safety being the basic concern. Specifically concerning the motors, respondent testified that the hydraulic system in October 1962 and at the time of trial was water-filled and still contained sand. Respondent also testified he and his wife had used his boat on about six occasions since October 1962. He stated that due to various alleged structural and mechanical difficulties, his longest run during this period was restricted to less than two miles.

It further appears that on October 13, 1962, respondent secured a new yacht policy in the amount of $10,000 with the Royal Insurance Company, Limited. The application form for that insurance contained answers advising that *Skipton* had never been altered, repaired, or rebuilt; that its present market value was $12,000, and present replacement value $16,000; and that no vessel owned by respondent had sustained accident or loss within the past five years. In arranging this policy, Piperata testified that he proceeded through his local insurance agent, Edward P. Reilly, a representative of Royal. Continental Insurance was not contacted, Piperata said, because Clayton Boat Works, the *Skipton's* builder, which had set up the original policy, had since gone out of business.

Respecting the Royal application, respondent said that he had signed it in blank and thereafter transferred it to his wife for completion. Reilly, in his testimony, stated that he had given the form to Mrs. Piperata with instructions that she fill it out, have Mr. Piperata affix his signature, then return it to him for forwarding to the insurer. Reilly further testified that at no time did respondent make any representations to him concerning the value of the craft.

Continental Insurance Company contends in this litigation that it became legal owner of the *Skipton* upon total loss payment to Piperata. Continental founds it claim in its right to possess the vessel under the insurance contract and applicable law. In the alternative, the insurer demands reimbursement for some $7,221.00—the alleged difference between the $10,000 total payment under the policy and the amount spent by respondent for repairs—by which it charges respondent has been unjustly enriched.

Two main issues are presented by these claims: First, the respective rights and obligations of the parties under the Continental policy in issue, and the effect on these, if any, of the April 9th, 1962, letter rejecting and disclaiming ownership or interest; and second, the question of the actual value of the *Skipton* in October 1962 after repair.

In the hull insurance portion of the policy appears language providing that, "In the event of loss or damage it shall be lawful and necessary to and for the Assured * * * to use all lawful and proper efforts for the safeguard and/or recovery of the property lost or damaged." Then follows language in the form of the standard sue and labor clause averring that such acts neither affirm nor deny the liability of either party; that these acts shall be considered as done for the benefit of all concerned; and that when the loss or damage falls within coverage of the policy, all reasonable expenses incurred in preservation or recovery shall constitute a claim under the policy. In addition the contract provides that no such acts shall be considered as "a waiver or acceptance of abandonment"; and further: "No recovery for a constructive total loss shall be had hereunder unless the expense of recovering and repairing the vessel shall exceed the value specified for Hull Insurance."

 Certain guidelines are imposed by law in the interpretation of all insurance contracts. Thus, if the language in issue will support two conflicting meanings—one favorable to the

insurer, and the other favoring the insured—the latter must be applied. Ins. Co. of State of Pa. v. Palmieri, 81 N.J. Super. 170, 195 A.2d 205 (1963); Jaggers v. Merchants Indemnity Corp. of New York, 119 F.Supp. 22 (D.C.N.J. 1954); Allen N. Spooner & Son, Inc. v. Connecticut Fire Ins. Co., 314 F.2d 753 (2d Cir. 1963). More generally, the basic rule governing construction holds that policies "shall be read as they would be understood by members of the general public who purchase them." Edgewater Nat'l Bank v. Safeguard Ins. Co., 81 N.J.Super. 383, 388, 195 A.2d 653, 656 (1963); Hannon Motor Lines, Inc. v. Liberty Mutual Insurance Co., 214 F. Supp. 250 (W.D.Pa.1963).

Employing the above standards on the facts of this case, the court might view respondent's actions in salvaging his craft as wholly justifiable and proper. At the behest of insurer's agent, Piperata abandoned the lost skiff to the Corps of Army Engineers. Subsequently, Continental through a second agent rejected and disclaimed to respondent all ownership or interest in the vessel. On the basis of this communication, when *Skipton* was located, Piperata recanted his abandonment to the government and instituted recovery.

Libelant asserts, nonetheless, that because of payment for a total loss, it had a right in whatever may have remained of the insured boat. Such an equitable concept does indeed appear to have some basis in law.

 Constructive total loss occurs when the insured is deprived of the immediate benefit of the vessel, and the expense of repair or recovery exceeds a certain percentage of the insured value as stipulated in the insurance contract. Gilmore and Black, The Law of Admiralty § 2–14 (1957). The reason for this full payment privilege is to meet what would otherwise be a failure of the insurance policy to adequately protect the holder. Calmar S. S. Corp. v. Scott, 209 F.2d 852, 854 (2d Cir. 1954). In exchange for his right to total recovery,

however, the insured is obliged to transfer his interests in the ship to the insurer. This transfer is accomplished by noticing the insurer of an intent to abandon. If the insurer does so accept, it acquires the same title to the abandoned vessel as it would secure in actual purchase. Klein v. Globe & Rutgers Fire Ins. Co., 2 F.2d 137, 1941 (3d Cir. 1924); Vance, Handbook on the Law of Insurance, § 177 (1951). See also, 45 C.J.S. Insurance §§ 957–965 (1946).

■ This situation generally involves a located wreckage or a loss of identified dimensions. Where a vessel, on the other hand, is known to be wholly destroyed, or is so fragmented that it ceases to be a ship, it must be assessed an *actual* total loss. Calmar, supra, p. 854. Thus, in the typical case, both insured and insurer are able to make a reasonable evaluation as to their respective interests.

■ At bar, however, there are more difficult circumstances present. Here, at the time libelant was compelled to pay, *Skipton* was as yet unlocated. Unwilling to accept statutory liability under 33 U.S.C. § 409 [1], Continental rejected all ownership or interest in the vessel. While no case can be found precisely in point, related decisions have allowed the insurer to lay claim following total payment for constructive loss, despite a previous rejection of insured's abandonment and a disclaimer of liability. See, e. g., Republic of China v. National Union Fire Ins. Co., 163 F.Supp. 812 (D.C.Md.1958). The proper rule would seem to follow this decision. Generally, as against the owner, the insuring party should not lose his equity in a discovered vessel because of an earlier effort to avoid the liabilities associated with

ownership of its then unlocated wreckage. Once an insurer has paid the entire insured value, it should not have to choose between future liability or future ownership with respect to the insured. The equities associated with a total policy payment should continue between the parties until the insurer has an opportunity, within reasonable bounds of time, to survey the wreckage. Different relationships, of course, would exist as to the insurer and third parties. Should a third party salvage a theretofore lost vessel subsequent to insurer's rejection of ownership, for example, it might not be subject to the same equitable claim as is available in the instance of a wholly reimbursed insured owner.

■ While under the general rule outlined above, Continental would have an equitable right in the *Skipton* wreckage, the competing standards of construction first noted by the court, taken in light of libelant's conduct, militate strongly against its position. Piperata was not instructed to abandon to Continental, but to the Corps of Army Engineers. Furthermore, he was not advised at the time insurer rejected all ownership or interest that Continental would retain the right to salvage should he eventually recover; nor did the policy so expressly provide. See Republic of China v. National Union Fire Ins. Co., 151 F.Supp. 211, 237 (D.C.Md.1957).

Under the policy, respondent was obliged to exercise all proper efforts to recover or safeguard his craft. The plain meaning of this language seems to pertain to a situation involving both a located wreckage, and an absence of a total loss—actual or constructive. Piperata certainly could perform no such duty with respect to an undiscovered

---

1. That statute provides in pertinent part:
"* * * [W]henever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States * * *." 33 U.S. C.A. § 409 (1957).

5

vessel. Surely, also, this obligation could not reasonably extend beyond the time of determination of total loss, and payment therefor. The contract of insurance, adopting the so-called English rule, further provides that repair must be shown to exceed insured value for total constructive loss to be present. On the facts at bar, Continental was apparently convinced that a craft lost under the circumstances of the *Skipton,* and still missing thirty days after the loss, did satisfy this qualification. Libelant's own witness, Blond, testified to this effect as quoted above.

When Piperata did find his vessel, he was acting with the knowledge that Continental had in plain language rejected all ownership. Respondent is not a commercial ship owner; nor has he had training in interpreting contractual terms of art. Thus, he should not and can not be held responsible for a general familiarity with the often-confusing law of the sea, or a specific understanding of such concepts as "constructive total loss" and "abandonment."

While it is true that an insured cannot automatically employ a defense of ignorance to vitiate the legal and contractual rights of insurer, in this case such a rationale does seem justified. Here Piperata's actions were in no small part due to the misleading conduct of Continental. Added to this factor was the extremely poor condition of the vessel. Given these various circumstances, it is the court's judgment that Piperata had no legal obligation either to notify libelant or abdicate his right of salvage.

Even should the court decide otherwise, and affirm Continental's right to claim the *Skipton* hull as per the Republic of China rule [D.C.Md.1958], discussed supra, it could not honor libelant's demands. The record shows without contradiction that the *Skipton* in its discovered condition was valueless. Thus any effort to wholly reclaim the skiff and return it to pre-storm condition would have entailed a prohibitive cost.

Evidence adduced during trial also indicates that respondent expended considerable personal effort and some $2,700 in order to refloat his vessel. The court must conclude that the repaired *Skipton* in October 1962 was worth no more than what is represented by these endeavors. Mechanically, the motors were then, and are still, hampered by the sand and water of two months partial submersion; structurally, many of the replacement parts are not of equal quality as the originals; and, most significantly, *Skipton* is, and was following repair, of highly questionable seaworthiness. No claim of unjust enrichment can therefore be sustained. While it is true that Continental had no opportunity to make its own assessment of the sunken hull and independent judgment as to the feasibility of salvage, this circumstance must again be attributed to libelant's failure to adequately protect its rights and interests.

The court furthermore finds libelant's bad faith argument regarding the Royal policy of little persuasion. The facts presented at trial and not the representations of respondent's wife to a disinterested insurance company dictate our disposition as to *Skipton's* value.

The following observations can be made by way of summary: When a ship is lost with the wreckage or remains undiscovered, it may be deemed a constructive or actual total loss, the precise definition ultimately depending on the time since loss, the circumstances of the loss, and the type of vessel. Should the loss qualify as only constructive, as would probably best describe the *Skipton* experience, the owner is obliged to abandon all claim to his ship to the insurer in exchange for full insured payment. As to the owner, whether the insurer accepts or rejects abandonment, the latter has the equitable right to attempt salvage upon future discovery within some reasonable period of time.

The legalisms of a policy of insurance, however, must always defer somewhat to the layman's interpretation. The conduct of an insurer can further enlarge

upon his responsibilities to the insured, while simultaneously undermining his own contractual rights. Such is the instant case. The contingency of respondent's recovery of his skiff in the complete context of Continental's policy, its actions, and the applicable law, is simply not provided for.

As a final point, the court again takes notice of the extremely poor condition in which *Skipton* was found. Suffice to say for the present, that had the contrary been true, the equitable standing of libelant would be considerably enhanced.

Continental's libel and complaint are accordingly denied on all counts.

A form of order is to be submitted.