**CONTINENTAL INSURANCE COMPANY (Libellant), Appellant,**

v.

**The CLAYTON HARDTOP SKIFF Bearing Reg. NO. NJ 2281 B. (Formerly Known as the Skipton), Her Motors, etc., Anthony Piperata and Fidelity Union Trust Company.**

**No. 15435.**

United States Court of Appeals Third Circuit.

Argued Jan. 4, 1966.

Decided Oct. 13, 1966.

Timothy A. Hanan, New York City (Maurice B. McLaughlin, Jersey City, N. J., Macklin, Hanan & McKernan, New York City, on the brief), for libellant-appellant.

Henry W. Eckel, Jr., Washington, N. J. (Harold J. Curry, Phillipsburg, N. J., of counsel, on the brief), for respondent-appellee.

Before BIGGS, GANEY and FREED-MAN, Circuit Judges.

BIGGS, Circuit Judge.

The suit at bar is based on original and exclusive admiralty jurisidiction, 28 U.S. C. § 1333. The opinion of Judge Lane in the court below, 239 F.Supp. 815 (1965), contains a complete and accurate statement of relevant facts in this case. We shall not repeat them except where necessary.

The respondent-appellee, Piperata, owned a skiff, the "Skipton", and insured it for $10,000 with Continental Insurance Co., the libellant-appellant. The "Skipton" was "lost" during the hurricane of March 1962. On March 20, 1962 Piperata executed a proof of loss to Continental requesting total reimbursement in accordance with the terms of his policy. McNitt, a marine surveyor and adjuster for Continental, got in touch with Piperata and informed him by a letter dated April 2, 1962 of the necessity for him, Piperata, to reject and disclaim all ownership and interest in the "Skipton" if there was to be a total constructive loss of the vessel. Because of this letter on April 3, 1962, Piperata wrote a letter to the "Corps of Army Engineers, New York City" informing them of the loss of the "Skipton" and stating that "this letter is to notify you that I am abandoning subject vessel to the Corps of Army Engineers". The receipt of this letter was acknowledged by the Chief of the Operations Division of the Corps of Army Engineers in Philadelphia. Since the "Skipton" was lost from Little Egg Harbor in New Jersey the vessel was subject to the jurisdiction of the Philadelphia District. On April 9, 1962 "Marine Office of America"[1] issued a check drawn to Piperata in the amount of $10,000 and enclosed the check in a letter addressed to its local agent, The Thomson Agency, requesting Thomson to advise Piperata "that we reject and disclaim any ownership or interest in the vessel either in part or in whole." On April 25, 1962 Thomson forwarded the $10,000 check to Piperata. Acting pursuant to the letter of April 9, and to a second letter, dated April 24, from "Marine Office of America" to Thomson, the latter on Continental's behalf, informed Piperata of the insurer's intent to reject and disclaim all ownership interest. About the end of May the "Skipton" was found in a cove about 25 miles from Egg Harbor and was taken to "Silver Bay Marine" at Toms River, New Jersey, for repairs. Piperata did not notify Continental that the "Skipton" had been found. He did, however, by letter inform the Corps of Army Engineers at Philadelphia of this fact. There is no doubt that the "Skipton" when found was in bad condition. Piperata and Hosbach, one of Piperata's employees, testified in substance that the vessel was "junk", a hull sitting in the mud, with the inside hull and motors covered with sand and water. The vessel was resting in about five feet of water. Nasife, an independent witness and a fleet representative for Sun Oil Company, who had discovered the vessel, corroborated Piperata's and Hosbach's testimony. Bauer, a professional yacht broker, designer and marine surveyor of thirteen years' experience, was of the opinion that a hypothetical craft lost under circumstances such as those attendant upon the loss of the "Skipton" and found approximately two months later was "virtually worthless".

Piperata expended some $2650 for the repairs made by Silver Bay Marine. He testified also that Nasife worked four and one-half days in order to float and tow the vessel in for repairs, and that he himself had spent about ten days trying to locate the vessel and had worked some two weeks in tearing down and overhauling the motors at Toms River. Piperata testified that he caused the "Skipton" to be repaired, *inter alia,* for "sentimental reasons". There is testimony, accepted by the trial Judge, that when the "Skipton" was first returned to the water in October 1962 the condition of the vessel was "fair" but that the hydraulic action was water-filled and still contained

1. It was stipulated that "Marine Office of America" was the "marine end" of Continental Insurance Co.

sand. Piperata testified also, and his evidence was accepted by the trial court, that he and his wife had used the "Skipton" on about six occasions since October 1962 but that the longest run of the "Skipton" during this period was restricted to less than two miles. On October 13, 1962, Piperata secured a new yacht policy in the amount of $10,000 with the Royal Insurance Company, Limited. The application form for Royal insurance contained answers that the "Skipton" had never been altered, repaired or rebuilt; that its then market value was $12,000 and its replacement value was $16,000, and that no vessel owned by him had sustained accident or loss within the past five years.[2]

Disclaimers of ownership of a vessel as was done here by Piperata, according to Blond, "Hull Claims Manager" of the Marine Office of America, are for the purpose of minimizing the civil liability of both the owner and the insurer.[3] Blond's testimony must be read in connection with 33 U.S.C. Section 409.[4] This ties in with the doctrine of "constructive total loss". When Piperata abandoned the vessel to the Secretary of War, at the direction of Continental's agent, Continental was required to pay the full amount of the insurance. Piperata's policy with Continental contained the customary "constructive total loss" provision.[5] It will be noted that Piperata abandoned the vessel to the Secretary of War but that Continental did not abandon the vessel to the Secretary of War insofar as the record shows.

The Continental policy provided that in the event of damage "no recovery for a constructive total loss shall be had hereunder unless the expense of recovering and repairing the vessel shall exceed the value of the hull insurance." The value specified for hull insurance

2. Piperata testified that he had signed the Royal application for insurance in blank and thereafter transferred it to his wife for completion.

3. Blond testified (R. 134–36) in pertinent part in respect to this issue:
   "The customary procedure is to request the assured to abandon the boat to the Port of Engineers or Corps of Engineers, in order that his liability will be minimized, as well as our own.
   "Of course, in the event that this boat is floating around or should be submerged somewheres and some other boat or innocent vessel should come in contact with this vessel, therefore we first of all we [sic.] advise the assured usually to abandon the boat to the Corps of Engineers.
   "The Court: The Corps of Engineers takes that responsibility without protest?
   "The Witness: Yes, sir. They will accept this responsibility.
   "Then the assured, after he is paid his claim, after we are satisfied there is a constructive total loss or total loss of the vessel involved, when we pay him and send him his check, we write a letter in which we say that we reject and disclaim any liability either in whole or in part, for the simple reason that we ourselves do not want to assume any more of the assured's liability or we don't want the assured to be liable for anything that might happen, such as one of the Federal statutes requires the assured to either buoy the wreck, if he knows where the wreck is, or it is has to be marked in some way, which is again required by the Coast Guard."

4. Section 409 provides that it shall be unlawful to "carelessly sink, or permit or cause to be sunk" vessels in navigable channels, and that whenever a vessel is sunk in a navigable channel, accidentally or otherwise, it is the duty of the owner to mark it properly and to commence its immediate removal, and that failure to do so shall be considered an abandonment of the vessel "and subject the same to removal by the United States as provided" by law. The statute quoted is a criminal measure but its provisions in effect permit the owner to abandon his vessel to the Secretary of War and thereby relieve himself of future liability in respect to it.

5. For a concise description of the "constructive total loss doctrine" see Judge Learned Hand's opinion in Calmar S. S. Corporation v. Scott, 209 F.2d 852, 853–854 (2 Cir. 1954).
   The "Constructive total loss" clause of Piperata's policy contained the following proviso: "No recovery for a constructive total loss shall be had hereunder unless the expense of recovering and repairing the vessel shall exceed the value specified for Hull Insurance." This provision is the usual one.

was $10,000. The policy, therefore, applied the so-called English rule as compared to the American rule which is that a constructive total loss may be claimed if the cost of repairs is one-half of the agreed value. See Calmar S.S. Corp. v. Scott, 209 F.2d 852, 854 (2 Cir. 1954), and Bradlie & Gibbons v. Maryland Insurance Co., 37 U.S. 378, 9 L.Ed. 1123 (1838). See also Vance on Insurance, Hornbook Series, Sections 176, 177, wherein he states: "Upon receiving notice of abandonment, the underwriter may accept or reject the abandonment. If he accepts, he becomes at once liable for the whole of his insurance, and also becomes entitled to all rights which the insured possessed in the thing insured. He acquires the same title to the abandoned vessel as he might have acquired by purchase. He may save and repair her, sell her, or otherwise do as he will with her. If the injury to the vessel was due to the tort of another, the insurer's right of subrogation, heretofore limited to the amount of payments made by him, becomes extended by abandonment to the full amount recoverable from the tort feasor, even though that may exceed the amount of insurance paid.

"The acceptance of an abandonment fixes the rights of the parties, and no subsequent developments affecting the expediency of either the abandonment or the acceptance can give either party the right to rescind the transaction."

As was stated by Judge Learned Hand in Calmar S.S. Corp. v. Scott, supra, at 854: "To meet what would otherwise be a failure of the policy to accomplish its purpose, the doctrine of 'constructive total loss' was devised, which gives the insured the privilege of compelling the insurer to pay the full amount at once in exchange for the transfer of the wreck. Since this is in effect a transfer forced upon the insurer, it was necessary to hedge it against abuse by the insured; and it is for this reason that the condition was imposed that there must be some relation between the extent of the injury and the value of the ship, when restored." In short, when the insurer has

accepted the application of the doctrine of constructive total loss the insurer becomes the transferee of the vessel and the insured in effect loses his interest therein. This is what happened here. Thereafter Piperata recovered the "Skipton", in very bad condition indeed, and expended several thousand dollars on its repairs which, in the judgment of the court below, were inadequate to make it fully seaworthy. But as Judge Hand pointed out in his Calmar S.S. Corp. opinion, the forced transfer of a vessel under the doctrine of constructive total loss must be subject to some "hedge" to prevent abuse by the insured. Otherwise there would be an unjust enrichment of the insured. Upon a valid abandonment the insured is divested of all of his interest in the vessel and the insurer becomes entitled to all the right, title or interest of the insured. Mason v. Marine Insurance Co., 110 F. 452, 54 L.R.A. 700 (C.C.A.6, 1901).

Winter in his Marine Insurance, 3rd Edition, at 396 states: "Underwriters may always refuse to accept abandonment. As soon as a case appears hopeless, it is the usual practice for the owner to tender and the underwriter to refuse abandonment. The rights of both parties having thus been preserved, the assured should continue to seek means to recover the property under the requirements of the sue and labor clause until absolute proof of the constructive total loss of the property can be demonstrated." Continental's policy contains a "sue and labor" clause. See Vance on Insurance, supra, at 939–41.

The doctrine of "constructive total loss" was applied in Calmar S.S. Corp. v. Scott, supra, 209 F.2d at 854, "to relieve the owner of the embarrassment of having upon his hands a ship, completely useless as she lies, and being without remedy until such time as she can be recovered and repaired, which may mean an indefinite postponement." In the instant case Continental accepted Piperata's claim of constructive total loss since the "Skipton" was "lost" and its possible discovery was postponed for an indefinite time.

The trial court in its opinion, 239 F.Supp. at 820, states: "While no case can be found precisely in point, related decisions have allowed the insurer to lay claim following total payment for constructive loss, despite a previous rejection of insured's abandonment and a disclaimer of liability. See, e. g., Republic of China v. National Union Fire Ins. Co., 163 F.Supp. 812 (D.C.Md.1958). The proper rule would seem to follow this decision. Generally, as against the owner, the insuring party should not lose his equity in a discovered vessel because of an earlier effort to avoid the liabilities associated with ownership of its then unlocated wreckage. Once an insurer has paid the entire insured value, it should not have to choose between future liability or future ownership with respect to the insured. The equities associated with a total policy payment should continue between the parties until the insurer has an opportunity, within reasonable bounds of time, to survey the wreckage." The statement quoted, in our opinion, represents the rule of law applicable here, but the trial court did not follow it. In fact, as will be recalled, Piperata failed to inform Continental of the recovery of the "Skipton". Continental had a right to claim the "Skipton's" hull under the rule of the Republic of China v. National Union Fire Insurance Co., supra, and the court below was in error in concluding Continental was not entitled to make such a claim.

But the trial court rested its decision upon another ground. It concluded that the record shows that the "Skipton" in its discovered condition was "valueless", and thus any effort to reclaim the vessel and return it to pre-storm condition "would have entailed a prohibitive cost." 239 F.Supp. at 821. Continental apparently did not examine the vessel before trial but rested its case on the fact that Piperata had secured a Royal Indemnity Company insurance policy, stating that the replacement value of the vessel was $16,000 and that its market value was $12,000, and that the repairs, which made the vessel operable for trips limited to two miles, plus Piperata's and Hosbach's labors, amount to approximately $3,000. Continental contends that the admissions in the Royal Insurance Co. policy are binding on Piperata, citing Purofied Down Products Corp. v. Travelers Fire Insurance Co., 278 F.2d 439 (2 Cir. 1960). These admissions are binding, of course, between Royal Insurance Co. and Piperata,[6] but not on Piperata in the suit at bar. The Purofied Down Products Corp. opinion does not support Continental's contention. Couch on Insurance 2d, Section 35:135 (1961) states that, "In the United States the rule is that a representation to one insurer cannot be evidence of a like representation to another insurer, on application for a different policy, on the same ship and risks." Nicoll v. American Insurance Co., 18 Fed.Cas. page 231, No. 10259 (1847). Section 35:135 is cited as applying to value and cost of an insured's property. See id. at Section 37:680.

The "constructive total loss" of the "Skipton" caused Continental to pay immediately to Piperata the full amount of insurance, $10,000. In return Continental received the transfer of the wreck which was, at the time of the transfer, "lost". The trial court deemed Piperata to be in the position of a "salvor". Since, by operation of the doctrine of "constructive total loss", Piperata no longer had any legal interest in the "Skipton", his prior ownership did not prevent him from acting as a salvor. In our opinion the court below was not in error in awarding to Piperata the status of a salvor. To create such a status three elements must be present, as they were present in the case at bar, viz.: "a marine peril, voluntary service, and success in whole or in part." Norris, The Law of Salvage, Section 47 et seq. (1958). However, once having salved the "Skipton" Piperata failed to notify Continental. The fact that Piperata may have believed he was the

6. Gilmore and Black, The Law of Admiralty, Section 2–16 (1957); New York & Cuba Mail S.S. Co. v. Royal Exchange Assur., 154 F. 315 (C.C.A. 2, 1907).

owner of the "Skipton", under a mistaken concept of his legal rights, does not excuse his misappropriation of the ship to his own use. See Norris, The Law of Salvage, Section 106 (1958); The Mabel, 61 F.2d 537 (9 Cir. 1932). The salvor has the right to salvage but he does not achieve ownership of the vessel by salving it, at least under the circumstances at bar.

■■■■■ It is not clear from the record when Continental became aware of the recovery of the "Skipton" but we cannot doubt it had the opportunity to make an examination of the "Skipton" prior to trial and failed to do so. Continental insists that the burden of proof is on Piperata due to the Royal Indemnity Policy. But the court below was entitled to disregard the stated values of the "Skipton" under the Royal Indemnity Policy. However, the trial court in our opinion has adopted an unacceptable method of ascertaining the damages of the parties. We think that the court below in its finding that the vessel when discovered was worthless failed to take into consideration the rights of the parties. It is true that Piperata is a layman but nonetheless he is bound by the principles of admiralty law. The court below lays emphasis upon "the extremely poor condition in which the *Skipton* was found," and apparently took the position that whatever may be the present value of the "Skipton" that value was created by Piperata's own efforts, owing Continental nothing. We have given this due consideration and conclude that the court's findings and conclusions are not justified by the evidence or by the law.

■■■■ What should be the judgment? It is difficult to say upon the present record, but we are of the opinion that the court below must balance equities. It is possible that when this has been done the prayer of the complaint that the "Skipton" be awarded to the appellant, Continental, should be granted but perhaps only if Piperata, or anyone standing in his shoes, receives from Continental the value of the repairs made to the vessel. In so stating we are not unmindful of the rights of a salvor or those of the insurer,

and the course that we have mentioned may or may not be pursued with legal propriety by the court below. If Piperata is found guilty of misconduct he, of course, is not entitled to the benefits of a salvor's position. We do not intend to suggest that he was guilty of misconduct in view of his layman's position. This is a matter already scrutinized by the district judge which should, perhaps, have further examination upon remand. See The Mabel, 61 F.2d 537 (9 Cir. 1932); Danner v. United States, 99 F.Supp. 880 (S.D.N.Y.1951).

The judgment of the court below in favor of Piperata will be vacated and a new trial ordered. At that trial Continental should be given the opportunity to make proof of the value of the vessel following its repairs. Piperata, of course, must be given the opportunity, if he desires to avail himself of it, to enlarge the record with any proper additional evidence which will support his position.